WAUSAU MEDICAL CENTER, S.C., Plaintiff-Appellant,

v.

Mark W. ASPLUND, M.D. and Mark W. Asplund, M.D., S.C., Defendants-Respondents.

Court of Appeals

*Nos. 92–3117, 93–0890. Submitted on briefs December 8, 1993.—Decided February 8, 1994.*

(Also reported in 514 N.W.2d 34.)

275

276

277

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Cassandra B. Westgate* and *John R. Runde* of *Terwilliger, Wakeen, Piehler & Conway, S.C.* of Wausau.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Robert W. Zimmerman* and *Debra Hayes Colcord* of *Mallery & Zimmerman, S.C.* of Wausau.

Before Cane, P.J., LaRocque and Myse, JJ.

CANE, P.J.  Wausau Medical Center (WMC) appeals four orders that: (1) denied WMC a temporary injunction prohibiting Mark Asplund, M.D., from practicing medicine in Marathon County; (2) granted summary judgment to Asplund and his service corporation, dismissing WMC's counterclaim asserting causes of action against Asplund in contract, promissory estoppel, negligent and intentional misrepresentation, and conspiracy to injure business in violation of § 134.01, STATS.; (3) granted Asplund summary judgment on an amended claim alleging breach of good faith and fair dealing; and (4) granted Asplund costs for items WMC contends are not taxable. Because WMC presents a number of arguments to support this appeal, each argument will be set out within our discussion of that argument. We reject WMC's arguments, and, therefore, affirm.

## FACTS

Dr. Asplund was twice employed as a general and vascular surgeon at WMC, a multi-specialty clinic. His first employment was from August 1988 to the end of July 1989. Asplund was WMC's first vascular surgeon, and this was Asplund's first professional practice following his residency. With this employment, Asplund entered into a contract with WMC that contained a restrictive covenant. Asplund voluntarily terminated his employment and moved to Iowa to participate in a transplant program in July 1989. WMC did not have a vascular surgeon between July 1989 and August 1990.

Within a year, Asplund decided that he wanted to return to Wausau. Asplund began negotiations with WMC. The negotiations broke off at one point because Asplund wanted the restrictive covenant stricken from the new contract, and WMC refused to do so. Nevertheless, Asplund commenced a second term of employment in August 1990 after signing an employment contract that contained a restrictive covenant. The covenant, which was identical to the one contained in his first contract, stated:

> Covenant Not to Compete. The Employee agrees that if his employment with the Corporation is terminated for any reason he will not engage in the practice of medicine or any phase or specialty thereof in competition with the Employer for a period of two (2) years from the date of termination of his employment within Marathon County, Wisconsin. The Employee hereby consents to an issuance of an injunction by a court of competent jurisdiction to enjoin the violation of the foregoing in addition to any other remedies available to the Corporation. In lieu of said injunction, the Corporation shall have the option to recover as liquidated

damages from the Employee a sum equal to twenty percent (20%) of the total cumulative professional charges made by the Employee during the twelve-month period immediately preceding the termination date.

In September 1990, forty-five days after he started, Asplund gave WMC sixty days' notice of his employment termination. Asplund formed a service corporation, Mark Asplund, S.C., while still employed at WMC. After his employment at WMC was terminated, he began his surgery practice in Wausau as an employee of the service corporation.

Asplund originally commenced this action by seeking to have the restrictive covenant declared unenforceable.[1] Initially, WMC obtained a five-day temporary restraining order but was later denied a temporary injunction following a hearing. WMC filed a counterclaim and a third-party complaint against Asplund and his service corporation. Asplund voluntarily dismissed his claim, making WMC the plaintiff, and he then moved for summary judgment dismissing all WMC's claims against him and the service corporation. The trial court granted summary judgment in favor of Asplund, who sought costs, which were also granted.

## THE RESTRICTIVE COVENANT

When reviewing a summary judgment, we apply the same methodology as the trial court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 314-15, 401 N.W.2d

---

[1] When we refer to the restrictive covenant, unless otherwise specified, we are referring to the covenant contained in Asplund's second, 1990, employment contract. It is the restrictive covenant in the second contract that WMC seeks to enforce.

816, 820 (1987). Whether a particular employment restraint is reasonably necessary has been held to be a question of law that must be resolved with reference to the facts of the particular case. *Geocaris v. Surgical Consultants, Ltd.*, 100 Wis. 2d 387, 388, 302 N.W.2d 76, 77-78 (Ct. App. 1981). Summary judgment is proper when there is no genuine issue of material fact in dispute relative to the reasonableness of the agreement. *Rollins Burdick Hunter, Inc. v. Hamilton*, 101 Wis. 2d 460, 470, 304 N.W.2d 752, 757 (1981).

The following canons of construction of restrictive covenants have been adopted: (1) These restrictions are prima facie suspect; (2) they must withstand close scrutiny to pass legal muster as being reasonable; (3) they will not be construed to extend beyond their proper import or further than the language of the contract absolutely requires; and (4) they are to be construed in favor of the employee. *Streiff v. American Family Mut. Ins. Co.*, 118 Wis. 2d 602, 610-11, 348 N.W.2d 505, 510 (1984) (*citing Zimmermann v. Brennan*, 78 Wis. 2d 510, 514-15, 254 N.W.2d 719, 721 (1977); *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 218-19, 267 N.W.2d 242, 250 (1978)). Although WMC correctly points out that restrictive covenants between physicians are not disfavored, this was with regard to a specific set of facts. *See Oudenhoven v. Nishioka*, 52 Wis. 2d 503, 505, 190 N.W.2d 920, 921 (1971).[2] *Oudenhoven* does not provide an exception to the gen-

---

[2] *Oudenhoven* referred to a fact situation in which an established physician employs a younger medical practitioner as his partner and, in return for the opportunity of new professional training and experience, the young practitioner agrees to not enter into competitive practice for a certain time after the partnership terminates.

eral rule that restrictive covenants are prima facie suspect. However, it illustrates how a covenant's necessity is determined according to each particular set of facts. *See Geocaris*, 100 Wis. 2d at 388, 302 N.W.2d at 77-78.

Under § 103.465, STATS.,[3] a covenant not to compete within a specific time and a specific territory is lawful "only if the restrictions imposed are reasonably necessary for the protection of the employer." Five inquiries are made in evaluating the enforceability of a covenant not to compete. The covenant must: (1) be necessary for the protection of the employer; (2) provide a reasonable time restriction; (3) provide a reasonable territorial limit; (4) be reasonable as to the employee; and (5) be reasonable as to the general public. *Chuck Wagon Catering, Inc. v. Raduege*, 88 Wis. 2d 740, 751, 277 N.W.2d 787, 792 (1979). Section 103.465, STATS., provides that any unreasonable portion of the covenant not to compete voids the entire covenant even if the remaining portions would be enforceable.[4]

Despite the summary judgment procedure, the affidavits in support and in opposition to the summary judgment, along with their correlating depositions,

---

[3] Section 103.465, STATS., provides:

A covenant by an assistant, servant or agent not to compete with his [or her] employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

[4] *See, supra* note 3.

provide this court with a substantial factual record establishing the totality of the circumstances. *See Rollins,* 101 Wis. 2d at 471, 304 N.W.2d at 757. It is undisputed that under the employment contract WMC is attempting to enforce, Asplund only worked approximately three-and-one-half months. Thus, our inquiry is whether WMC acquired a protectible interest in the three-and-one-half months that the applicable employ- ment contract was in force.

Our first inquiry is whether the covenant not to compete was necessary to protect WMC. The trial court concluded that it was not and, as a result, found the entire covenant void. The principal reason for enforcing a restrictive covenant is to prevent dissemination of trade secrets or *unfair* competition. "An employer is not entitled to be protected against legitimate and ordinary competition of the type a stranger could give. There must be some additional special facts and circumstances which render the restrictive covenant reasonably necessary for the protection of the employer's business." *Lakeside Oil Co. v. Slutsky,* 8 Wis. 2d 157, 163, 98 N.W.2d 415, 419 (1959).

Our consideration of whether the covenant not to compete was necessary to protect WMC is two-fold. First, we must look to the facts as of the time the contract was entered into. At that point, it can be argued that WMC was anticipating the unfair competition that Asplund could provide in the event that his employment was terminated. WMC's apparent concern was that Asplund's association with WMC would enhance his reputation and thereby make him a formidable competitor; i.e., that his enhanced reputation would be a special circumstance which would render the restrictive covenant reasonably necessary for the

protection of WMC's business. *See id.* WMC was also concerned that it would provide Asplund with a client and referral base, which he would later take with him, again making the covenant reasonably necessary to protect WMC's business.

Assuming without deciding that these facts would lead to the conclusion that the covenant's inception was reasonable, to stop here would be contrary to the general rule that covenants not to compete are suspect and are only to be enforced in order to prevent the unfair competitive use of information and contacts acquired as a result of the employment. *Chuck Wagon Catering,* 88 Wis. 2d at 751, 277 N.W.2d at 792. Whether the protectible interest is to be determined solely according to the facts as of the time the contract was entered into or whether facts subsequent to entering into the contract are also considered has never been specifically addressed in Wisconsin.

While there is existing case law stating that the restrictive covenant is to be considered "in light of all the surrounding circumstances with reference to which the contract was made," *Rakestraw v. Lanier,* 30 S.E. 735, 738 (Ga. 1898), the practice in Wisconsin has been to also consider the facts surrounding the employment itself. *See, e.g., Geocaris,* 100 Wis. 2d at 388, 302 N.W.2d at 78 (employer acquired protectible interest when it provided employee with referral contacts and aided in the development of his reputation); *Pollack v. Calimag,* 157 Wis. 2d 222, 237, 458 N.W.2d 591, 599 (Ct. App. 1990) (court considered events during the employment including the considerable time, effort and advertising expended to generate new customers, who were usually referred to Pollack and the substantial effort and training provided by employer which contributed to Pollack becoming an expert in his field).

■

Consequently, we conclude that facts surrounding the employment itself are also to be considered. While WMC could reasonably anticipate a protectible interest, as of the signing of the contract, since Asplund was not yet provided with any clients, referrals or an enhanced reputation, WMC had not yet acquired a protectible interest. Therefore we must go on to determine whether the anticipated protectible interest was ever acquired. We conclude that it was not.

WMC argues that by providing Asplund with referral contacts and aiding the development of his reputation among area physicians, WMC acquired a protectible right to reasonably prevent competition from Asplund. Although these provisions may typically result in a protectible interest, *see Geocaris*, 100 Wis. 2d at 388-89, 302 N.W.2d at 77-78, "what is reasonable varies from case to case, and what may be unreasonable in one instance may be very reasonable in another." *Rollins*, 101 Wis. 2d at 468, 304 N.W.2d at 756.

One reason the trial court gave for its conclusion that the covenant was not needed to reasonably prevent competition from Asplund was the referral pattern in Wausau, in which independent physicians refer almost exclusively to other independent physicians while WMC physicians refer almost exclusively to other WMC physicians. In other words, because Asplund now receives his referrals from an entirely different group of physicians than he did at WMC, he was not in competition with WMC, and the covenant was thereby not reasonably necessary to protect WMC. WMC argues that the trial court erred in granting summary judgment because the nature of the referral pattern was a disputed fact.

We agree that the nature of the Wausau referral pattern is a disputed fact. While Asplund contends that independent physicians generally refer to independent physicians and WMC physicians generally refer to WMC physicians, there is evidence to the contrary.[5] However, we conclude that it is not a material factual dispute because the reasonableness of the agreement would not be affected one way or the other by the resolution of this dispute. *See* § 802.08(2), STATS.

This is particularly so because the evidence contradicting Asplund's characterization of the referral pattern is with regard to the pattern for the general surgery department. It is not disputed that while employed at WMC, eighty percent of Asplund's patients were referred to him by other WMC physicians. It is also not disputed that in the year after Asplund terminated his employment with WMC less than one-half of one percent of his charges came from WMC patients. Therefore, although the referral pattern for the general surgery department is disputed, we conclude that Asplund's referral pattern shows that after he terminated his employment with WMC his referral base was completely different, and hence he only provided WMC with the type of competition that a stranger could provide. *See Lakeside Oil*, 8 Wis. 2d at 163, 98 N.W.2d at 419.

---

[5] WMC's attorney submitted an affidavit in opposition to summary judgment that directs us to the November 1990 deposition of Gene Oesterich. In the deposition Oesterich estimates that within the general surgery department, while the referral pattern would vary from physician to physician, "roughly half of the referrals come from within the organization and half from outside on average."

It is also undisputed that the amount of work Asplund did in his first forty-five days of employment was sparse, to the point of concern on the part of WMC. It is further undisputed that in the remaining sixty days of his employment, after he gave his termination notice, he received very few referrals from his colleagues. We conclude, as a matter of law, that the minimal referral contacts WMC provided Asplund with during his short tenure do not amount to a reasonable protectible interest. Further, we conclude that his short three-and-one-half-month tenure with WMC was insufficient to materially aid in his reputation. His brief employment with WMC was such that Asplund only provides "legitimate and ordinary competition of the type that a stranger could give." *Lakeside Oil*, 8 Wis. 2d at 163, 98 N.W.2d at 419. Therefore, WMC did not acquire a protectible right against competition by Asplund through this brief employment on either of these bases.

WMC next argues that it acquired a protectible interest because Asplund performed unique specialized services. WMC relies on *Behnke v. Hertz Corp.*, 70 Wis. 2d 818, 235 N.W.2d 690 (1975), for the proposition that where the employee's services are unique, grounds exist for upholding the covenant. WMC's argument is that because vascular surgery is a unique service, the agreement should be upheld. However, *Behnke* states that "[a] promise of a former employee will not ordinarily be enforced so as to preclude him *from exercising skill and knowledge acquired in his employer's business* ... unless the services of the employee are of a unique character." *Id.* at 822, 235 N.W.2d at 693 (quoting RESTATEMENT 2 CONTRACTS § 516(f), comment h at 1001 (1932)) (emphasis added).

Accordingly, in order to establish a protectible interest, WMC would have to establish that Asplund's unique skills were acquired at WMC. No one disputes that Asplund acquired his vascular surgery skills prior to his employment, that there was no other vascular surgeon at WMC from whom he could enhance these unique skills, and that Asplund's short tenure at WMC prevented him from significantly improving his skills. Thus, the evidence is undisputed that Asplund did not acquire his unique skills from his employment with WMC, and, consequently, WMC did not acquire a protectible interest.

WMC's final argument regarding the restrictive covenant is that Asplund had access to competitive information at WMC and, as a result, the covenant is reasonably necessary to protect WMC. The key piece of competitive information was the patient lists. The idea that the protection of a business' stock of customers is a legitimate interest of an employer originated in *Lakeside Oil Co.*, 8 Wis. 2d at 163, 98 N.W.2d at 719. *Lakeside* stated that one of the "special facts" that courts have determined render a restrictive covenant reasonably necessary is the nature of the relationship between the employee and the employer's customers. *Id.* Under this theory, called the customer-contact theory, if the employee had such control or influence over the customers that the employee would be able to take the customers away from the employer, the employer has a legitimate protectible interest. Consequently, in *Pollack*, we concluded that the patient lists that Pollack, a physician, had access to provided his employer with a legitimate interest in protecting itself from unfair competition. However, the facts in *Pollack* are distinguishable.

Pollack was the only full-time physician at the clinic and was the clinic's biggest producer. Pollack's employer spent substantial time, effort and advertising to generate new patients, most of whom were referred to Pollack. "It is reasonable to believe that many of [the employer's] patients considered themselves Pollack's patients and likely would have followed him to a new location." *Id.* at 237, 458 N.W.2d at 599. In other words, under these special circumstances, Pollack had the kind of control and influence over his patients that result in a legitimate protectible interest under *Lakeside*.

In this case, although Asplund did not take any of this information with him, during his employment he had access to patient lists. However, Asplund, who was one of many physicians at WMC, did not have the type of control or influence over his patients so as to use this access for any competitive advantage. This was especially true in light of his surgery practice. Unlike, for example, a general practitioner, a patient's relationship with a surgeon is, hopefully, restricted to one encounter. Further, WMC did not put forth substantial efforts to acquire new patients for Asplund, and gave him very few referrals during his final sixty days there. Additionally, in his short tenure Asplund could not have established the type of "special relationship" with his patients so as to have such influence. Therefore, WMC did not acquire a protectible right to reasonably prevent competition from Asplund by virtue of his access to the patient lists.

WMC also contends that Asplund's access to a list of WMC charges also provides them with a protectible right to reasonably prevent competition from Asplund. We fail to see, and WMC does not point out, how knowl-

289

edge of its charges provides Asplund with any sort of competitive advantage.

As mentioned, restrictive covenants are suspect and must be closely scrutinized to pass legal muster as being reasonable. *Streiff*, 118 Wis. 2d at 610-11, 348 N.W.2d at 510. Because WMC failed to prove that the covenant not to compete is reasonably necessary for the protection of WMC, we conclude that the covenant is unenforceable. *See* § 103.465, STATS. Because our conclusion is dispositive with regard to the enforceability of the covenant, we need not address WMC's remaining arguments concerning the restrictive covenant.

## MISREPRESENTATION

WMC also alleges causes of action for both negligent and intentional misrepresentation. WMC contends that Asplund misrepresented his interest in working for WMC by assuring the Board of Directors that he wanted to return to work for WMC. The trial court concluded that Asplund's statement was one of opinion, not one of fact, and, thus, did not meet the first element of legal misrepresentation.

The essential elements of misrepresentation are that: (1) A representation of fact was made; (2) The representation was false; (3) The defendant made the representation knowing it was untrue, or recklessly, without caring whether it was true or false, or the defendant failed to exercise ordinary care in making the representation and in ascertaining the facts; and (4) The plaintiff believed such representation to be true and relied thereon to its detriment. *Ollerman v. O'Rourke Co.,* 94 Wis. 2d 17, 25, 288 N.W.2d 95, 99 (1980).

The facts are undisputed. Asplund said he wanted to return to WMC, and he did return. Asplund never stated any intent with regard to the length of his employment. To argue that Asplund's statement that he wanted to return to WMC was a representation that he would stay there indefinitely is contrary to the terms of the employment contract, which contemplated the termination of Asplund's employment and attempted to make provisions regarding such termination.

We agree with the trial court that Asplund's statement was one of opinion and not of fact; consequently his representation does not meet the first element of misrepresentation. Furthermore, "promises or representations of things to be done in the future are not statements of fact. Statements of fact must relate to present or preexisting facts, not something to occur in the future." *U.S. Oil Co. v. Midwest Auto Care Servs.*, 150 Wis. 2d 80, 87, 440 N.W.2d 825, 827 (Ct. App. 1989).

Additionally, because Asplund did in fact return to WMC, his representation does not meet the second element; his representation that he wanted to return was not false. Asplund's return also renders the exception to the "preexisting fact" fact rule—where the promisor at the time the promise was made, had a present intention not to perform—inapplicable. *See id.*

██

While it is true that statements of opinion may result in a misrepresentation cause of action if the speaker knows of facts incompatible with his opinion, *see Lundin v. Shimanski*, 124 Wis. 2d 175, 192, 368 N.W.2d 676, 684 (1985), because WMC has presented no factual material from which a reasonable jury could infer that Asplund knew of facts incompatible with his

opinion when he made it, we conclude that there is no genuine issue of material fact.[6] Consequently, summary judgment was proper.

## BREACH OF GOOD FAITH AND FAIR DEALING

Next, WMC contends that Asplund did not exercise good faith and fair dealing in the performance and negotiation of the employment contract. WMC contends that the trial court misapplied the law when it concluded that there could not be a claim for a violation of the implied duty of good faith and fair dealing because Asplund terminated the contract according to the specific terms of the contract. *See Ford Motor Co. v. Lyons*, 137 Wis. 2d 397, 405 N.W.2d 354 (Ct. App. 1987). When *Ford Motor* is applied, it argues, the facts are sufficient to preclude summary judgment.

In *Ford Motor*, there was an agreement between Ford Credit and the dealership in which Ford Credit agreed to pay Ford for vehicles delivered to the dealership, and, in return, the dealership would pay a monthly interest charge. Once the vehicle was sold, the dealership would pay the invoice price to Ford Credit. The dealership complained that Ford Credit breached its implied duty of good faith when it failed to limit the dealership's credit line and by paying for unordered vehicles and vehicles it was not required to pay for under the agreement. Although Ford Credit found support for its actions in the contract language, we concluded that Ford Credit violated the implied condition of good faith in the contract when it raised the

---

[6] The only evidence that WMC presents is that Asplund chose to leave after only 45 days of employment. This evidence is insufficient; a reasonable jury could not infer that Asplund was not willing to work at WMC at the time he stated that he wanted to work there and signed the employment contract.

dealership's credit line and paid for unordered vehicles when the dealership's financial position was very tenuous. *Id.* at 442-43, 405 N.W.2d at 372.

On the other hand, Asplund cites *Super Valu Stores, Inc. v. D-Mart Food Stores, Inc.*, 146 Wis. 2d 568, 431 N.W.2d 721 (Ct. App. 1988), where Super Valu entered into a retail sales agreement with D-Mart, a grocery store in Wisconsin Rapids. The agreement did not grant D-Mart the exclusive right to operate a Super Valu store in Wisconsin Rapids or any other given territory. To the contrary, under the agreement "Super Valu retained the 'right to choose and select its . . . retailers and to enter into Super Valu Retailer Agreements with other parties at Super Valu's sole choice and discretion . . . .' " *Id.* at 572, 431 N.W.2d at 723. Super Valu then decided to open another store in Wisconsin Rapids, and the owner of D-Mart argued that by doing so it breached its duty of good faith dealing under the contract. We concluded that where

> a contracting party complains of acts of the other party which are specifically authorized in their agreement, we do not see how there can be any breach of the covenant of good faith. Indeed, it would be a contradiction in terms to characterize an act contemplated by the plain language of the parties, contract as a "bad faith" breach of that contract.

*Id.* at 577, 431 N.W.2d at 726.

*Ford Motor* and *Super Valu* are distinguishable, and *Super Valu* applies in this case. In *Ford Motor,* the act the dealership complained of was not a specific act authorized by the contract. The dealership did not complain about the extension of credit by Ford Credit, which would generally be agreed upon so that the deal-

293

ership could maintain its inventory, but the overextension of credit and the payment for unordered vehicles when the dealership was in a tenuous financial position. In *Super Valu*, on the other hand, the contracting party did complain about an act specifically authorized by the contract; the contract provided that Super Valu could enter into retailer agreements at its sole discretion, and the contemplation of such an agreement is the very act that D-Mart complained about.

Similarly, Asplund could not have breached the implied covenant of good faith by terminating his contract because the contract contemplates that he could do so at any time, as long as he gave sixty days' notice, which he did. WMC argues that Asplund negotiated the contract in bad faith because he never intended to stay at WMC. However, this cannot be a violation of the contract's implied provision of good faith when the contract itself provided that Asplund could terminate his employment *at any time.* Therefore, we agree with the trial court that, because the act that WMC complains of, Asplund terminating his employment, was specifically authorized by the contract, exercising this right was not a breach of good faith and fair dealing as a matter of law.

## PROMISSORY ESTOPPEL

WMC also contends that when Asplund stated that he "really" wanted to return to WMC, he made a promise that induced action on the part of WMC, namely paying moving and insurance costs for Asplund, and therefore the theory of promissory estop-

pel applies.[7] It is unclear what WMC is attempting to estop Asplund from; it simply requests that this court permit a remedy to reflect the "moral consciousness of honesty and fair representations in all business dealings." *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 695, 133 N.W.2d 267, 273 (1965). In any event, we conclude that Asplund's statement that he wanted to return to WMC was not a promise. Even if it could be construed as a promise to return, he did return and the statement cannot be construed as a promise to stay for any definite period of time. Therefore, WMC's promissory estoppel argument fails.

## TEMPORARY INJUNCTION

WMC's next contention is that the court should have granted the temporary injunction against Asplund. WMC argues that judicial estoppel should have precluded Asplund from making contradicting arguments in the temporary injunction hearing and the summary judgment hearing. We conclude that this argument has not been preserved for appeal because it is raised for the first time on appeal; therefore we shall not consider it. *See Segall v. Hurwitz*, 114 Wis. 2d 471, 489, 339 N.W.2d 333, 342 (Ct. App. 1983).

---

[7] *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267, 275 (1965), sets out the three requirements to a promissory estoppel cause of action: (1) Did the promisor make a promise which was reasonably expected to induce an action or forbearance of a definite and substantial character on the part of the promise? (2) Did the promise actually induce such action or forbearance? (3) Can injustice be avoided only by enforcement of the promise?

## CONSPIRACY TO INJURE BUSINESS AND TORTIOUS INTERFERENCE WITH CONTRACT

Next, WMC argues that Asplund and his service corporation conspired to injure the business of WMC, in violation of § 134.01, STATS., and that the service corporation tortiously interfered with the contract between Asplund and WMC. We agree with the trial court that in both of these arguments WMC is using a legal fiction, that a corporation is a separate person, to prove facts necessary for its arguments.

WMC contends that if the referral pattern is in fact that independents only refer to independents, then Asplund and his service corporation ("and all other independent surgeons in Wausau") combined to maliciously injure WMC by not referring to them. We conclude that Asplund and his service corporation do not satisfy the requirement that two or more people combine to injure WMC. When two or more persons combine for the purpose of "wilfully or maliciously injuring another in his reputation, trade, business or profession," they have violated § 134.01, STATS. Asplund's personal service corporation is merely the alter ego of Asplund, and thus does not constitute the "two or more persons" needed to establish a violation of § 134.01.

Furthermore, "credible evidence that is sufficient to sustain a jury verdict of conspiracy must be of a quantum that the trial judge can conclude leads to a reasonable inference of conspiracy. If not, it should not be submitted to a jury at all." *Maleki v. Fine-Lando Clinic Chartered, S.C.*, 162 Wis. 2d 73, 85, 469 N.W.2d 629, 634 (1991). Except for the testimony of a referral pattern, WMC presents no evidence to indicate that Asplund maliciously intended to injure WMC. The

referral pattern alone does not lead to a reasonable inference of malicious intent or conspiracy, therefore we reject WMC's contention that this issue should have been determined by a jury.

With regard to WMC's contention that Asplund's service corporation tortiously interfered with the contract between Asplund and WMC, we again conclude that because Asplund and his service corporation are in effect the same person, this cause of action cannot stand. Tortious interference with a contract occurs when someone "intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract . . . ." *Charolais Breeding Ranches, Ltd. v. FPC Secur. Corp.*, 90 Wis. 2d 97, 105, 279 N.W.2d 493, 497 (Ct. App. 1979) (quoting RESTATEMENT (SECOND) OF TORTS § 766 at 7 (1979)). To argue that the service corporation interfered with the contract between WMC and Asplund is to say that Asplund interfered with the contract by inducing himself not to perform the contract. Because Asplund's interference with his own contract with WMC is not an action encompassed by a tortious interference with contract cause of action, we affirm the trial court's grant of summary judgment on this issue.

## DISBURSEMENTS

WMC argues that the trial court improperly granted certain costs Asplund incurred. WMC first contends that the costs incurred before the dismissal of Asplund's action for declaratory judgment should not have been granted. We do not agree. The costs incurred before the dismissal of Asplund's actions were costs

297

that were incurred for the defense of WMC's claims against Asplund and his service corporation.

Next, WMC contends that the trial court improperly granted certain costs that are not specifically recognized as taxable costs. WMC first disputes the photocopying expenses. *Zintek v. Perchik*, 163 Wis. 2d 439, 471 N.W.2d 522 (Ct. App. 1991), is directly on point:

> Although the items in dispute are not among those items expressly recited in sec. 814.04, Stats., the statute also contains a "catch-all" provision. The statute mandates costs to a prevailing [party] for "[a]ll the necessary disbursements and fees allowed by law . . . ." Section 814.04(2). Among the costs "allowed by law" are those covered by the omnibus costs statute, sec. 814.036, Stats.: "If a situation arises in which the allowance of costs is not covered by ss. 814.01 to 814.035, the allowance shall be in the discretion of the court."

*Id.* at 476, 471 N.W.2d at 536-37 (footnote omitted). In other words, photocopying expenses can be taxed. WMC does not present the argument that the trial court erroneously exercised its discretion, therefore we conclude that the award of photocopying expenses was appropriate. We also conclude that the facsimile expenses were also taxable under § 814.036, STATS.

WMC's final argument concerns the expert fees, specifically the award of $1,841 for deposition preparation by Duncan Bourne. WMC moved to compel the attendance of Bourne pursuant to § 804.01(2)(d), STATS. Section 804.01(2)(d)3 states:

> Unless manifest injustice would result, the court shall require that the party seeking discovery pay the expert a reasonable fee for the time spent in

> responding to discovery under the last sentence of
> subds. 1 and 2; and with respect to discovery
> obtained under the last sentence of subd. 1 , the
> court may require, and with respect to discovery
> obtained under subd. 2, the court shall require, the
> party seeking discovery to pay the other party a fair
> portion of the fees and expenses reasonably
> incurred by the latter party in obtaining facts and
> opinions from the expert.

Therefore, although it may be preferable that the trial court require payment of the expert's fees in its response to the motion to compel discovery, nothing in § 804.01(2)(d)3 precludes the trial court from requiring the payment of these fees in response to Asplund's request for costs pursuant to § 814.03, STATS. Section 814.03 reads: "If the plaintiff is not entitled to costs under s. 814.01(1) or (3),.the defendant shall be allowed costs to be computed on the basis of the demands of the complaint, except as provided in ss. 943.46(3)(c) and 943.47(4)(b)." Thus, we conclude that the costs awarded for Bourne's deposition preparation were authorized.

Alternatively, WMC contends that the costs awarded for Bourne's preparation were excessive. We conclude that the trial court's determination that the hourly rate of $131.50 was reasonable, considering Bourne's expertise and the Chicago market, and was not an erroneous exercise of discretion. Therefore, we affirm the taxation of $1,841 for Bourne's deposition preparation.

Asplund argues that the trial court should have doubled allowable costs. Because Asplund did not cross-appeal with regard to this issue, it is not properly before this court. Therefore, we will not address it.

*By the Court.*—Orders affirmed.