In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2257

Fredric Karl Saecker,

Plaintiff-Appellant,

v.

William H. Thorie and Doar, Drill & Skow, S.C.,

Defendants-Appellees.


Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99-C-671-S--John C. Shabaz, Chief Judge.


Argued November 15, 2000--Decided December 12, 2000


 Before Posner, Easterbrook, and Kanne, Circuit Judges.

 Posner, Circuit Judge.  This is a diversity suit for legal malpractice, and at once we confront an issue of federal subject-matter jurisdiction. The plaintiff's jurisdictional statement, in violation of 7th Cir. R. 28(a)(1), does not indicate the state of citizenship of either the plaintiff or the defendants, who compound the error in their jurisdictional statement by failing both to point out the error and to supply the missing information. From the record it is apparent that the plaintiff is a citizen of Minnesota and the individual defendant a citizen of Wisconsin; but what of the law-firm defendant? The name of the firm is followed by "S.C.," and while its counsel informs us that this means "service corporation" and that the firm is incorporated and has its principal place of business in Wisconsin, he confessed to being unacquainted with the nature of a Wisconsin service corporation either generally or in reference to its status for purposes of the diversity jurisdiction. If the service corporation is assimilated to a regular business corporation, then jurisdiction is of course secure; but if it is assimilated to a partnership, including a limited partnership, or to an L.L.C. (limited-liability company), the existence of diversity would depend on the citizenship of the partners, Carden v. Arkoma Associates, 494 U.S. 185, 195-96 (1990); Northern

Trust Co. v. Bunge Corp., 899 F.2d 591, 594 (7th Cir. 1990); Cosgrove v. Bartolotta, 150 F.3d 729, 731 (7th Cir. 1998), which the record does not disclose.

The answer is given by our decision in Cote v. Wadel, 796 F.2d 981, 983 (7th Cir. 1986), where we held, primarily to avoid multiplying confusing distinctions within the category of corporations, that a professional corporation is to be treated the same as a regular business corporation, even if the professional corporation does not protect its principals from personal liability or serve to raise capital from passive investors. See also Saxe, Bacon & Bolan, P.C. v. Martindale, Hubbell, Inc., 710 F.2d 87, 89 (2d Cir. 1983); cf. CCC Information Services, Inc. v. American Salvage Pool Ass'n, 230 F.3d 342, 346 (7th Cir. 2000); National Ass'n of Realtors v. National Real Estate Ass'n, Inc., 894 F.2d 937, 939 (7th Cir. 1990); Mutual Service Casualty Ins. Co. v. Country Life Ins. Co., 859 F.2d 548, 550-51 (7th Cir. 1988). "Service corporation" is Wisconsin's name for professional corporation, see Wis. Stat. sec.sec. 180.901-.921; Wausau Medical Center, S.C. v. Asplund, 514 N.W.2d 34, 37, 44 (Wis. App. 1994), and so comes within the rule of the Cote case.

Cote was a "first generation" professional-corporation case. The original impetus for the formation of professional corporations was to obtain tax benefits, not to limit liability. Even today, some professional-corporation statutes do not limit the personal liability of the principals of such a corporation, corresponding to partners in the traditional law-firm partnership. But many do. (See the useful discussions in Christopher C. Wang, "Breaking Up Is Hard to Do: Allocation of Fees From the Unfinished Business of a Professional Corporation," 64 U. Chi. L. Rev. 1367 (1997), and Debra L. Thill, "The Inherent Powers Doctrine and Regulation of the Practice of Law: Will Minnesota Attorneys Practicing in Professional Corporations or Limited Liability Companies Be Denied the Benefit of Statutory Liability Shields?" 20 Wm. Mitchell L. Rev. 1143 (1994).) Wisconsin's service-corporation statute is one of them. It protects the shareholders of such a corporation from vicarious liability for the negligence or other misconduct either of the corporation itself or of the other shareholders. Wis. Stat. sec. 180.1915. The statute does not shield the lawyer or other professional from unlimited liability for acts of the corporation in which he is personally complicit; and that means that if a lawyer practicing by himself incorporates as a service corporation, he obtains no limitation of his personal liability at all. But that is

equally true of the limited liability of shareholders of ordinary business corporations: they are not insulated from unlimited personal liability for acts on behalf of the corporation for which they could be sued personally.

There is thus no tension with National Ass'n of Realtors v. National Real Estate Ass'n, Inc., supra, 894 F.2d at 940, which carved an exception to the rule of Cote v. Wadel for cases in which the shareholders of a corporation rather than the corporation itself are the real parties in interest; in that case it is their citizenship, not that of the corporation, that counts. See also CCC Information Services, Inc. v. American Salvage Pool Ass'n, supra, 230 F.3d at 347; Northern Trust Co. v. Bunge Corp., supra, 899 F.2d at 594. The exception is inapplicable to this case. Apart from Thorie himself, the personal assets of the shareholders of Doar, Drill & Skrow, S.C., are not at risk.

Any tension between Cote and later cases derives not from National Ass'n of Realtors v. National Real Estate Ass'n but from the limited partnership and L.L.C. cases, since, functionally, they are even closer to standard business corporations than are professional (or service) corporations yet they are treated as ordinary partnerships for purposes of determining whether there is diversity jurisdiction. But as neither party has asked us to reexamine Cote, and no case has questioned its rule, and the Wisconsin service-corporation goes far to assimilate professional to standard business corporations, we shall adhere to the rule of that case at least for now.

On the merits, the district judge granted summary judgment for the defendants on the ground that Wisconsin's six-year statute of limitations for legal malpractice, Wis. Stat. sec. 893.53, had run. In January of 1990, the plaintiff, Saecker, represented by the individual defendant, Thorie (a member of the defendant firm), had been convicted in a Wisconsin state court of rape and other crimes and sentenced to 15 years in prison. Saecker's family had wanted DNA testing of bodily fluids and hair found on the victim of the rape, but Thorie had advised against this on the erroneous ground that the results of DNA testing would not be admissible at Saecker's trial. Saecker's appellate remedies were exhausted on April 2, 1991, but in subsequent postconviction proceedings in which he was represented by new counsel he successfully moved for the DNA testing, which exonerated him. In October of 1996, after a new trial was ordered, all charges against him were dropped. He brought this suit in May of 1999. The district court ruled that the

statute of limitations had begun to run on April 2, 1991, when the Wisconsin Supreme Court denied Saecker's petition to review the affirmance of his conviction, and so expired before he brought his suit.

Under Wisconsin law a statute of limitations begins to run when the plaintiff discovers or should have discovered both his injury and the person who, and the act that, were the probable cause of the injury. See Borello v. U.S. Oil Co., 388 N.W.2d 140, 146 (Wis. 1986); Smith v. Herrling, Myse, Swain & Dyer, Ltd., 565 N.W.2d 809, 811 (Wis. App. 1997); Wiskunas v. Birnbaum, 23 F.3d 1264, 1266 (7th Cir. 1994). He needn't know that he has a claim against that person for that act; he has the statutory period to determine whether he has a claim and if so to prepare and file his suit, and that is time enough given that he knows that he has been injured and knows also who injured him and by what conduct.

The parties agree that the date of injury was April 2, 1991, and in view of their agreement we need not speculate on alternative possibilities, such as the date of his conviction. Cf. Smith v. Herrling, Myse, Swain & Dyer, Ltd., supra, 565 N.W.2d at 811-12. The quarrel is over the date on which Saecker discovered or should have discovered that the likely cause of the injury was Thorie's failure to obtain a DNA test that would have averted the conviction. April 2, 1991, the date selected by the district court, is too early. Saecker had no reason to believe that Thorie was giving him erroneous advice about the admissibility of DNA evidence. He had no reason to believe, therefore, that his conviction had been caused by a decision of his lawyer. He did have reason to believe this by January 17, 1993, the date on which his new lawyer moved for an order to conduct a DNA test; and this date was more than six years before he sued. He could not be certain then that Thorie had injured him by failing to have made such a motion, because he could not be certain what the outcome of the test would be. The fact that he passed the test, however, suggests that he had a good idea he would pass it (that is, he knew he was innocent). He knew enough, we think, to have set the statute of limitations running. See id. at 811; Wiskunas v. Birnbaum, supra, 23 F.3d at 1266.

Though not mentioned by the parties, the Wisconsin courts might hold that the statute of limitations was tolled until October 1996, when the state finally dropped all charges against Saecker. In most states, including Wisconsin, a legal malpractice suit against a criminal defense attorney requires a showing that the criminal

defendant (that is, the malpractice plaintiff) actually was innocent, implying acquittal and more--that the defendant really was innocent and wasn't just acquitted because the state could not carry its heavy burden of proof. E.g., Harris v. Bowe, 505 N.W.2d 159, 162 (Wis. App. 1993); Mahoney v. Shaheen, Cappiello, Stein & Gordon, 727 A.2d 996, 998-99 (N.H. 1999); Wiley v. County of San Diego, 966 P.2d 983, 991 (Cal. 1998); Peeler v. Hughes & Luce, 909 S.W.2d 494, 497-98 (Tex. 1995). The thinking behind this rule is that a guilty person should not be allowed to reduce his punishment by getting a money judgment against his lawyer.

Until October 1996, Saecker's innocence had not been determined. But if therefore the running of the statute of limitations was tolled until then, this would not help him. The doctrine of equitable tolling, the doctrine that is applicable when a plaintiff seeks tolling for reasons other than acts by the defendant that prevented him from suing earlier, requires the plaintiff to sue as early as he can after expiration of the statute of limitations. E.g., Elmore v. Henderson, 227 F.3d 1009, 1013 (7th Cir. 2000); United States v. Duke, 229 F.3d 627, 630-31 (7th Cir. 2000). Saecker had no excuse for waiting two and a half years after the charges against him were dropped to bring his malpractice suit.

The suit is also barred by the doctrine of judicial estoppel, which forbids a party who has prevailed in one suit to repudiate the ground on which he prevailed in order to win a subsequent suit. E.g., United States v. Hook, 195 F.3d 299, 306 (7th Cir. 1999); Ogden Martin System of Indianapolis, Inc. v. Whiting Corp., 179 F.3d 523, 526-27 (7th Cir. 1999). Previous federal cases have treated it as a federal procedural doctrine applicable regardless of the version of the doctrine embraced by the state that rendered the judgment sought to be used to work the estoppel. Ogden Martin Systems of Indianapolis, Inc. v. Whiting Corp., supra, 179 F.3d at 527 n. 1; Edwards v. Aetna Life Ins. Co., 690 F.2d 595, 597 n. 4 (6th Cir. 1982); Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 n. 4 (4th Cir. 1982). They have reasoned as follows: the purpose of the doctrine is to reduce the temptation to fraud in litigation, Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir. 1998); State v. Perry, 548 N.W.2d 817, 821 (Wis. 1996); the interest of the second court (the one the winner of a previous suit wishes to persuade on the basis of a ground that he successfully fought against in that suit) in not being defrauded is as great as the interest of the first court; the doctrine is therefore part of the second court's arsenal of self-protective

weaponry.

This conclusion is in tension, however, with 28 U.S.C. sec. 1738, as interpreted by the Supreme Court in Marrese v. American Academy of Orthopaedic Surgeons, 470 U.S. 373 (1985). In holding that section 1738 requires federal courts to apply the preclusion (res judicata and collateral estoppel) principles of the state whose judgment is sought to be used to block relitigation, the Court expressly rejected, id. at 385, the argument (which this court, in the decision that the Court reversed, had adopted, 726 F.2d 1150, 1154 (7th Cir. 1984) (en banc) (plurality opinion)) that since preclusion is intended to conserve judicial resources as well as to spare parties the expense and uncertainty of relitigation, the court asked to give preclusive weight to an earlier judgment should be entitled to give weight to its own views of the proper scope of preclusion. Judicial estoppel is a kind of preclusion doctrine, and here it is a judgment of the State of Wisconsin that is sought to be used to preclude relitigation of an issue (the issue of Thorie's negligence).

We need not try to resolve the tension in that case. Wisconsin has a doctrine of judicial estoppel, and it is identical to the federal doctrine. See State v. Perry, supra, 548 N.W.2d at 821-22, referring approvingly to federal cases, including cases of this court. As there is no conflict between the federal and Wisconsin versions of the doctrine, we can proceed to apply it without resolving the issue flagged in the preceding paragraph.

When Saecker, having in postconviction proceedings obtained the DNA test results, moved for a new trial on the basis of newly discovered evidence, he had to show that the evidence had not been available to him at trial. Part of the explanation that he offered, embracing Thorie's unsound advice, was that DNA evidence was believed to be inadmissible--which if true would eliminate the basis for his malpractice claim. The Wisconsin courts that adjudicated his motion for a new trial duly held that DNA testing had been such a novelty in 1990 that Saecker, and so by implication Thorie, could not be faulted for not having moved for such testing. This ruling is inconsistent with the malpractice claim, which Saecker could have preserved only by arguing in the postconviction proceedings that his failure to move for DNA testing at trial was due not to DNA evidence being inadmissible but rather to ineffective assistance by his trial counsel.

Affirmed.