In the
United States Court of Appeals
For the Seventh Circuit

No. 00-3180

United States of America,

Plaintiff-Appellee,

v.

Donald Newell,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 CR 849-1--Elaine E. Bucklo, Judge.

Argued January 12, 2001--Decided February 9, 2001

Before Posner, Ripple, and Evans, Circuit Judges.

Posner, Circuit Judge.  The defendant was
convicted of willfully filing false federal
income tax returns for 1994 for both himself and
a Subchapter S corporation, LPM, Inc. (which
we'll call "Inc." for a reason that will become
evident in a moment), in violation of 26 U.S.C.
sec. 7606(1). He was sentenced to 30 months in
prison and fined $60,000. His principal ground
for appeal is that the government was allowed to
proceed on an "assignment of income" theory
without having disclosed it in the indictment,
without a jury instruction on it, and without
proving it beyond a reasonable doubt.

Newell was president and 50 percent shareholder
of Inc., a large commodity trader. In 1993, irate
that the Clinton Administration was planning to
increase federal income tax rates for high
earners like himself, Newell established a
Bermuda corporation, LPM, Ltd. ("Ltd."), to which
he planned to funnel income that would otherwise
be received by Inc. Ltd. was to be "a nameplate
on the door," "a dummy corporation"; "it wasn't
going to do anything" except receive income
intended for Inc.

The Abu Dhabi Investment Authority (ADIA) had
become a client of Inc.'s in 1990 and had made a
contract pursuant to which it owed Inc. more than

$1.3 million for services that Inc. had rendered to it in 1993. Newell directed ADIA to send the money to one of Ltd.'s bank accounts in Bermuda, and ADIA did so early in 1994. Inc. did not report this money as income; nor did Newell, though he was obligated to report his share of Inc.'s income because Inc. was a Subchapter S corporation. When Inc.'s controller, who knew that ADIA had been billed by Inc. for the services rendered in 1993, asked Newell where the money was, Newell was evasive; and when nevertheless the controller recorded the money as a receipt to Inc. he told her to remove the entry from Inc.'s books. He denied to an outside accountant that Ltd. had been involved in any significant transactions, or had any other activity, in 1994, and also falsely denied, on his income tax return for that year, that he had signatory auhority over any foreign bank accounts. To another accountant, who stumbled across a record of Ltd.'s receipt of the ADIA money, Newell lied by saying that the money had not been recorded as income to Inc. because it was being claimed by a Swiss company.

Newell argues that the government, in contending that he should have reported the ADIA fee as income to Inc. and derivatively to himself, is necessarily relying on the "assignment of income" concept announced in Lucas v. Earl, 281 U.S. 111 (1930). Lucas held that a taxpayer cannot escape his tax obligations by assigning income that he has earned to another person. Suppose ADIA owed money to Inc. that would be income to Inc. if and when Inc. received the money, and suppose Inc. told ADIA to send the money to a favorite charity of Newell's; the money would still be income to Inc., even though Inc. had never received it and indeed had formally assigned the right to receive it to the charity. Newell does not deny any of this. Rather, he argues that if Inc. assigned its contract with ADIA to another entity, namely Ltd., the income generated by that contract would be taxable income to the assignee, not to Inc., just as, if an author assigned the copyright in one of his books, the assignee would be the person liable for income tax on the royalties generated by the copyright unless (as is common) the author had reserved the right to receive the royalties. Meisner v. United States, 133 F.3d 654, 656-57 (8th Cir. 1998); compare Harper & Row, Publishers, Inc. v. Nation Enterprises, Inc., 471 U.S. 539, 547 (1985).

But Newell is painting with much too broad a brush. To shift the tax liability, the assignor must relinquish his control over the activity that generates the income; the income must be the fruit of the contract or the property itself, and not of his ongoing income-producing activity. See

Blair v. Commissioner, 300 U.S. 5 (1937); Greene v. United States, 13 F.3d 577, 582-83 (2d Cir. 1994). This means, in the case of a contract, that in order to shift the tax liability to the assignee the assignor either must assign the duty to perform along with the right to be paid or must have completed performance before he assigned the contract; otherwise it is he, not the contract, or the assignee, that is producing the contractual income--it is his income, and he is just shifting it to someone else in order to avoid paying income tax on it. To state the same point differently, an anticipatory assignment of income, that is, an assignment of income not yet generated, as distinct from the assignment of an income-generating contract or property right, does not shift the tax liability from the assignor's shoulders, Helvering v. Horst, 311 U.S. 112, 118 (1940); Boris I. Bittker et al., Federal Income Taxation of Corporations and Shareholders para. 7.07 (4th ed. 1979), unless, as we said, the duty to produce the income is assigned also, so that the assignor is out of the income-producing picture. In Lucas v. Earl, where the taxpayer had assigned an interest in his future income to his wife, the Court held that when the income came in, it was his income, because it was generated by his efforts, including his decisions about what to charge for his services and what expenses to incur. See also Commissioner v. Sunnen, 333 U.S. 591, 608-10 (1948); Greene v. United States, supra, 13 F.3d at 582. Similarly, the income on the contract with ADIA was generated by the exertions of Inc., not of Ltd.

This case is actually much weaker for the taxpayer than Lucas v. Earl. At least there the assignment was to a separate person, the taxpayer's wife. Here the assignment was to an alter ego of the taxpayer, as in Kluener v. Commissioner, 154 F.3d 630, 636 (6th Cir. 1998). It dignifies the taxpayer's defense unduly to say that he was prosecuted under the "assignment of income" doctrine, a doctrine that presupposes two parties, an assignor and an assignee, where here there was only one, a self-assignor. The assignment was a sham. For that matter, it is unclear whether there ever was an assignment. Newell argues that the government was obliged to prove that Inc. had not assigned its contract with ADIA to Ltd. We have just seen that even if there was an assignment, it would not let him off the hook. And his argument flouts the principle that a plaintiff's burden, even in a criminal case, is not to disprove every possibility that might exonerate the defendant, Patterson v. New York, 432 U.S. 197, 208 (1977); United States v. Petty, 132 F.3d 373, 378 (7th Cir. 1997); Stanford v. Kuwait Airways Corp., 89 F.3d 117,

124 (2d Cir. 1996); United States v. Restrepo, 884 F.2d 1294, 1296 (9th Cir. 1989), but merely to present enough evidence to allow a rational jury to infer guilt beyond a reasonable doubt. A criminal defendant can always require the government to prove his guilt to the jury's satisfaction, no matter how compelling the government's evidence. But failure to produce evidence to rebut a strong case by the prosecution will defeat any argument that the evidence of guilt was insufficient. See, e.g., United States v. Kelly, 991 F.2d 1308, 1315 (7th Cir. 1993). Confronted with the government's proof, Newell's only chance was to persuade the jury that he really had assigned Inc.'s contract with ADIA to Ltd., that the contract itself, rather than Inc.'s services, was the source of the contract income, and that Ltd. was not just a dummy corporation. At the irreducible minimum, as even he concedes, there would have to be an assignment; and if there had been an assignment, Newell would have had it in his possession and would have produced it. His failure to do so was eloquent.

To require the government in every case of evading income tax by diverting income to another person to prove that the income wasn't the fruit of a contract or property that had been assigned to that person would have only one effect, and that would be to facilitate tax evasion. There is no precedent for imposing such a requirement. Holland v. United States, 348 U.S. 121, 135-36 (1954); United States v. Chu, 779 F.2d 356, 364-66 (7th Cir. 1985); United States v. Stayback, 212 F.2d 313, 317 (3d Cir. 1954).

We move to a second issue. The prosecution used some Bermudan records at trial, and 18 U.S.C. sec. 3505(b) provides that a party to a federal criminal case who wants to offer a foreign record into evidence must give the other party written notice of that intention "at the arraignment or as soon after the arraignment as practicable"; and this was not done. The consequence of such a failure is not, however, as Newell argues, automatic exclusion from evidence. Exclusionary rules are disfavored as remedies for nonconstitutional violations of law. United States v. Kontny, No. 00-3004, 2001 WL 8793, at *3 (7th Cir. Jan. 4, 2001). The remedy for a violation of section 3505(b) is to object at trial on the ground of prejudice resulting from the violation. The objection was made but properly denied because the failure to notify Newell of the government's intention did not harm his defense in the slightest. The foreign records in question were Newell's own records of his Bermudan activities and he knew the government was going to use them at trial to illuminate the nature and purpose of Ltd., the Bermudan dummy in

which Newell had parked the ADIA fee.

We turn finally to the sentence. The sentencing guidelines provide for a heavier sentence in a tax case if "sophisticated means were used to impede discovery of the existence or extent of the offense." U.S.S.G. sec. 2T1.1(b)(2); see United States v. Kontny, supra, at *5. The commentary to the guideline, which is authoritative, uses "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore banking accounts" as the paradigmatic example of sophisticated concealment; and it is an exact description of this case. But at closing argument the government's lawyer told the jury that Newell's scheme was "not particularly sophisticated," and Newell argues that, in light of this comment, the doctrine of judicial estoppel barred the sentencing enhancement. The argument is frivolous.

The doctrine of judicial estoppel instructs that having obtained a judgment in a case on some ground a litigant cannot turn around and in another case seek a judgment on an inconsistent ground. E.g., Saecker v. Thorie, 234 F.3d 1010, 1014 (7th Cir. 2000); Moriarty v. Svec, 233 F.3d 955, 962 (7th Cir. 2000); Lydon v. Boston Sand & Gravel Co., 175 F.3d 6, 12-13 (1st Cir. 1999). There is nothing like that here, since the conviction is not the judgment in a criminal case; the sentence is; and so the prosecutor wasn't trying to obtain a second judgment. The making of inconsistent arguments within a single case is more common than otherwise, and closely resembles pleading in the alternative, which is allowed. Fed. R. Civ. P. 8(e)(2); Allen v. Zurich Ins. Co., 667 F.2d 1162, 1167 (4th Cir. 1982). Occasional formulations of the doctrine of judicial estoppel that omit mention of the requirement that there have been a previous judgment, see, e.g., Ahrens v. Perot Systems Corp., 205 F.3d 831, 833 (5th Cir. 2000), are mostly inadvertent, yet there is, as noncommittally remarked in Hossaini v. Western Missouri Medical Center, 140 F.3d 1140, 1143 (8th Cir. 1998), a minority view, undesirably loose and clearly not the view of this circuit, that "judicial estoppel applies even where no court has accepted the prior assertion if the party taking contrary positions demonstrates an intent to play 'fast and loose' with the courts."

One decision states that the prior inconsistent position must have been "adopted by the court in some manner, perhaps, for example, by obtaining a judgment." Maharaj v. BankAmerica Corp., 128 F.3d 94, 98 (2d Cir. 1997) (citation omitted). That too strikes us as too vague and loose; better to

assimilate judicial estoppel in this respect to res judicata and collateral estoppel, which require a judgment.

 A distantly related doctrine, "mend the hold," sometimes erroneously confused with judicial estoppel, as in Estate of Ashman v. Commissioner, 213 F.3d 541, 543 (9th Cir. 2000), limits the right of a contract promisor, especially an insurer, to switch defenses in the course of a dispute. See, e.g., Level 3 Communications, Inc. v. Federal Ins. Co., 168 F.3d 956, 960 (7th Cir. 1999); Patz v. St. Paul Fire & Marine Ins. Co., 15 F.3d 699, 703 (7th Cir. 1994); Harbor Ins. Co. v. Continental Bank Corp., 922 F.2d 357, 362-64 (7th Cir. 1991). That has no relevance to this case.

 There is, no doubt, confusion and uncertainty in the case law (though not of this circuit) over the scope of the doctrine of judicial estoppel. But no court would apply it in the way urged by Newell. The argument that Newell's tax dodge was unsophisticated was neither a ground for the conviction nor inconsistent with the position taken by the government at sentencing; it was just a way of asking the jury not to be bamboozled by the corporate setting into thinking that what Newell had done was a "sophisticated" and therefore perhaps lawful method of arranging his affairs in such a way that he and Ltd. would not be liable for income tax on the fee from ADIA. Everyone knows that financial sophistication enables a taxpayer to reduce his tax liability, and the prosecutor must have worried that the jury might equate sophistication to tax avoidance as distinct from tax evasion. There was no impropriety in his comment, no occasion for an invocation of judicial estoppel, and in fact no error at all in the conviction or sentence.

Affirmed.