**NORTHERN CROSSARM CO., INC., Plaintiff,**

v.

**CHEMICAL SPECIALITIES, INC., Defendant.**

No. 03–C–415–C.

United States District Court, W.D. Wisconsin.

May 18, 2004.

Gregory T. Everts, Madison, WI, for Plaintiff.

Jon G. Furlow, Michael Best & Freidrich, LLP, Madison, WI, for Defendant.

## OPINION AND ORDER

CRABB, District Judge.

This is a civil action for monetary relief, in which plaintiff Northern Crossarm Co., Inc. contends that defendant Chemical Specialities, Inc. breached the parties' marketing support agreement, breached its implied duty of good faith and enriched itself unjustly. The case is before the court on two motions: plaintiff's motion to alter and amend a judgment entered earlier in the case and defendant's supplemental motion for summary judgment on plaintiff's good faith and unjust enrichment claims. Plaintiff's claims arise out of a dispute regarding defendant's obligation to make market support payments for certain regional sales made by a third party.

In an opinion and order entered March 16, 2004, I granted defendant's motion for summary judgment with respect to this claim, concluding that the language of the market support agreement was ambiguous and that there was no record evidence that either party had expressed an intent or understanding that the market support agreement would extend to third party sales. Plaintiff has filed a motion for reconsideration.[1] In support of this motion,

---

1. In the initial order, I directed the clerk of court to enter judgment for defendant on plaintiff's breach of contract claim. This direction was erroneous. It prompted plaintiff

plaintiff contends the court made three basic errors: (1) concluding that the contract was ambiguous instead of broad; (2) failing to consider certain arguments that plaintiff asserts it raised with respect to the effect of extrinsic evidence; and (3) imposing on plaintiff the burden of proving that the parties actually agreed that market support payments would be made by third parties. Because none of plaintiff's arguments convince me that the decision was in error, the motion will be denied.

With respect to defendant's supplemental motion for summary judgment, I conclude that it must be denied with respect to plaintiff's duty of good faith and fair dealing claim. Construing the evidence in the light most favorable to plaintiff, a reasonable jury could find that defendant used the sublicensing agreement as a subterfuge to avoid its market support obligations. Defendant's motion will be granted with respect to plaintiff's unjust enrichment claim. Unjust enrichment is a quasi-contractual remedy available only when the parties have not otherwise made contractual arrangements to compensate one party for a benefit it conferred on the other. Although the market support agreement does not govern all material elements of the parties' business relationship, it encompasses the aspect relevant to plaintiff's unjust enrichment claim. Because the parties have a binding contract compensating plaintiff for its marketing efforts, plaintiff cannot recover under unjust enrichment.

## UNDISPUTED FACTS

Plaintiff Northern Crossarm Co., Inc., is a Wisconsin corporation with its headquarters and principal place of business in Chippewa Falls, Wisconsin. It is a wood treating company that sells crossarms, treated wood, laminated columns and underdeck systems used in a variety of outdoor applications in the Midwest. Defendant Chemical Specialities, Inc., is a North Carolina corporation with its headquarters and principal place of business in Charlotte, North Carolina. It produces an Alkaline Copper Quaternary (AC Q) wood preservative and other wood preservative products and sells them to wood treaters nationwide.

Since the 1940's Chromated Copper Arsenate (CCA) has been the most widely used wood treatment product in the world although it contains arsenic and chromium, which are identified as hazardous substances by the Environmental Protection Agency. In 1990, defendant introduced ACQ, which does not contain any substances on the hazardous list. ACQ is a patented product of Domtar, Inc, a Canadian corporation, which granted defendant an exclusive license to manufacture, use, market and sublicense the product in North America in exchange for royalty payments. This exclusive license runs until the expiration of the patent in June 30, 2007.

When ACQ was first introduced as an alternative to CCA, both of the two other

to file its motion to alter or amend the judgment pursuant to Fed.R.Civ.P. 59(e), under which a party must show a manifest error of law or fact or present newly discovered evidence. *FDIC v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986). An order correcting the error was issued on the same day that plaintiff filed its motion. Because judgment has not been entered on the breach of contract claim, plaintiff's motion will be treated as one for reconsideration. Defendant has filed a mo-

tion for leave to file a surreply, which is granted. Defendant argues that plaintiff must show clear error or substantial injustice to prevail on a motion for reconsideration. The parties appear to agree in substance on this standard. Because I do not believe that plaintiff has identified any reversible error or injustice, any subtle nuances that may exist between the parties' formulations of the appropriate standard are immaterial.

major CCA manufacturers, Osmose, Inc. and Arch, criticized the product openly. In response to this criticism, defendant promoted ACQ with marketing campaigns and lobbied at the state and federal level.

Plaintiff's president, Patrick Bischel, approached defendant in the early 1990's to purchase ACQ. Plaintiff was concerned about the low profit margins for CCA-treated wood caused by steep competition in the market and about the growing public pressure to prohibit the use of CCA because of its hazardous contents. Defendant agreed to sell to plaintiff and plaintiff started treating wood with ACQ in 1994. In order to do so, plaintiff invested approximately $600,000 in equipment and building costs for the construction of an ACQ wood treating facility. Eventually, defendant rebated some of the money plaintiff had spent on equipment. Plaintiff has always purchased and continues to purchase all of its ACQ products from defendant.

## A. *Marketing Initiatives*

Initially, defendant pursued a nationwide marketing strategy for ACQ. After a short time, it determined that a regional approach would be more effective. In implementing its regional approach, defendant established relationships with selected wood treaters in different regions of the United States; plaintiff was one of those regional treaters. In 1994, plaintiff was the only wood treater using ACQ in Minnesota, Iowa, Wisconsin, South Dakota or the Upper Peninsula of Michigan and one of only six ACQ treaters in the country. Soon after plaintiff started using ACQ, it began making sales call to retail lumber dealers to explain the differences between ACQ and CCA and let them know that they would be able to purchase ACQ-treated lumber from plaintiff shortly. Also in 1994, plaintiff participated in a number of conventions, radio shows and trade shows, made formal presentations to 63 state, county and city specifiers, issued 105 news releases to newspapers, radio and television outlets and held an open house for regional lumber dealers to introduce ACQ-treated lumber.

In 1995, plaintiff continued its marketing efforts by promoting ACQ at the Madison Area Builders Home and Garden Show and participating in a variety of other home shows throughout the Midwest. Plaintiff secured commitments from 20 retail lumber dealers to market ACQ-treated products that year. In 1996, plaintiff sponsored a golf outing for existing and potential customers for ACQ products. The following year, it continued to promote ACQ products at trade shows, employee training programs and on radio shows. Plaintiff acquired two large new customers for ACQ-treated products in 1997.

Plaintiff continues to engage in similar marketing initiatives, such as providing tours of its facilities to potential clients, government officials and academics, assisting with lobbying efforts, conducting email campaigns, distributing auto decals, hosting golf outings, appearing on television programs and providing information about ACQ to a variety of newspapers and magazines with information about ACQ. Government agencies and defendant have recognized plaintiff for its contribution in promoting ACQ. In 2000, defendant's vice president of marketing and business development characterized plaintiff as "the horse th[at] got us where we are" to his colleagues.

During this time, defendant both aided plaintiff's marketing efforts and engaged in its own regional marketing. Defendant supplied plaintiff with brochures, banners, store signs and referrals to local architects who would be in position to purchase or recommend ACQ-treated lumber. It also made the initial contacts with many of the print and broadcast media sources and

reimbursed plaintiff for some of its promotion efforts. By mid–1997, defendant had retained an advertising and public relations firm to assist it in preparing a market strategy that would establish ACQ as the preferred product to CCA. As part of this initiative, defendant targeted "big box" retailers such as Home Depot, Lowes, Menards, Hechinger/HQ and Home Base/Builder's Square.

### B. *Party Contracts*

#### 1. *Negotiations*

In 1997, plaintiff began to treat its wood exclusively with ACQ. At the time plaintiff made this decision, sales of CCA-treated lumber made up approximately one-third of its total treated wood sales. (The parties dispute plaintiff's reason or reasons for switching to ACQ-treated lumber exclusively. Plaintiff contends that it found it difficult to market both ACQ and CCA simultaneously and determined that ACQ was a higher quality product and less damaging to the environment. Defendant suggests that plaintiff made the switch because profit margins for ACQ-treated lumber were higher than those for CCA-treated products. This dispute is immaterial to the resolution of these motions.) In making this conversion, plaintiff spent between $25,000 and $35,000 expanding its plant.

Plaintiff began negotiating a supply agreement with defendant in early 1998. Bischel told defendant's representatives, Tom Fitzgerald and Steve Ainscough, that plaintiff did not want defendant to sell to any other wood treaters in Minnesota, Iowa, Wisconsin, South Dakota or the Upper Peninsula of Michigan. However, defendant refused to give plaintiff a long term exclusive right to purchase ACQ in this region. Bischel sought a price advantage over other regional treaters because he was concerned that its profit margins would erode as other treaters entered the market. After further negotiations, the parties reached an agreement in principle that defendant would make market support payments to compensate plaintiff for its past and future efforts in promoting ACQ in the region. Plaintiff and defendant made the specific terms of their agreement final in two contracts: a supply contract, which they executed initially in May 1998 and modified in November 1998, and a market support agreement, which they executed in November 1998. The parties never discussed the possibility that a third party might start selling ACQ preservative.

#### 2. *The May 1998 long-term supply agreement*

Under the supply agreement, defendant was to supply plaintiff with ACQ for five years and plaintiff would have exclusive rights for six months to purchase ACQ in a defined territory, which included Minnesota, Iowa, Wisconsin, South Dakota and the Upper Peninsula of Michigan. After six months, defendant could sell ACQ to other wood treaters in the region, but could not enter any long-term supply agreements with them so long as plaintiff continued purchasing ACQ at specified minimum levels. The parties did not address the issue of market support payments in the supply agreement because they feared that the payments could have implications under the Robinson–Patman Act; each retained outside counsel to examine the issue.

#### 3. *The market support agreement and modified long-term supply agreement*

On or about November 18, 1998, about six months after the initial signing of the supply contract, plaintiff and defendant entered into a market support agreement. The market support agreement indicates that its purpose is to "confirm[ ] [defendant's] agreement with [plaintiff] regarding the level of marketing support for ACQ Products, which [defendant] will provide in [plaintiff's] region." Specifically, it

provides that "[defendant] will provide marketing support at the rate of $0.50 per pound of ACQ Products sold to other ACQ treaters in your region." Plaintiff's region is defined as the same territory over which plaintiff's six-month exclusive right to purchase extended. The term was to be the same five-year period specified in the long-term supply agreement. CSI was entitled to "review the marketing support program with Northern Crossarm annually and [ ] adjust the marketing support program at those times." Pursuant to this obligation, defendant paid plaintiff $24,274.44 for certain sales defendant had made to Innovative Pine Technologies, a wood treater located in Superior, Wisconsin. Also on November 18, 1998, plaintiff and defendant reissued the long-term supply agreement, making only minor changes not relevant here.

### C. Sublicensing the ACQ Technology to Osmose

Despite its earlier criticism of ACQ, Osmose approached defendant in late 2000, seeking a license to manufacture and sell ACQ throughout North America. In March 2001, defendant sublicensed its ACQ technology to Osmose in an agreement under which Osmose is required to make royalty payments to defendant for each pound of ACQ Osmose sells.

On March 5, 2001, defendant sent a representative to meet with plaintiff's representatives to let them know about the agreement with Osmose before announcing it publicly. Plaintiff's representatives expressed displeasure with the agreement because it would create more competition in the ACQ market. They asked for a support package to insure that they would have an advantage over the wood treaters to whom Osmose might sell ACQ preservative. Defendant agreed to provide plaintiff with promotional support by having one of defendant's salespersons travel to Wisconsin, Minnesota, Michigan, Iowa and north-ern Illinois to promote ACQ-treated wood there. Bischel anticipated that defendant would pay plaintiff market support payments for Osmose's regional sales, although neither he nor any of defendant's representatives mentioned market support payments during these discussions. When the sublicensing agreement was announced publicly, defendant and Osmose released a joint press release to the effect that the agreement would expand the availability of ACQ-treated products in consumer and retail markets.

In 2002, Menards, one of the largest national "big box" lumber retailers, began to market ACQ treated lumber. Menards' wholly owned wood treater, Midwest Manufacturing, treats lumber at a plant approximately 15 miles from plaintiff's facility. It began purchasing ACQ treatment products from Osmose in December 2001. Between December 2001 and November 18, 2003, when the market support agreement expired, Osmose sold 5,232,172 pounds of ACQ to Midwest Manufacturing. In December 2003, defendant made its first sale ever to Menards, selling it 10,500 pounds.

On January 30, 2003, plaintiff told defendant's representative that it expected market support payments from defendant for the ACQ preservative sold by Osmose in the region. The parties' representatives had met on five previous occasions since the creation of the sublicensing agreement, but no one had mentioned market support payments for Osmose's regional ACQ sales. Defendant has refused plaintiff's request for market support payments for sales by Osmose.

### OPINION

#### A. Reconsideration of Plaintiff's Contract Claim

##### 1. Plain meaning

Plaintiff's primary argument is that the court erred in concluding that the lan-

guage in the market support agreement was ambiguous, rather than broad. In the market support agreement, defendant agreed to "provide marketing support at the rate of $0.50 per pound of ACQ [Alkaline Copper Quaternary] Products sold to other ACQ treaters in [plaintiff's] region," in recognition of plaintiff's efforts to promote ACQ in the retail market. At the time the parties entered the agreement, defendant held an exclusive license to manufacture ACQ. Later, defendant granted one of its competitors, Osmose, Inc., a sublicense, but refused to pay plaintiff market support payments for Osmose's regional ACQ sales. Plaintiff argued that defendant owed it market support payments under the contract for the ACQ that Osmose sold to other regional treaters. In concluding that the agreement was ambiguous in its provision of market support, I reasoned that:

> [T]he relevant clause, "ACQ Products sold to other treaters in your region" is incomplete. The parties have identified the object (ACQ products) and the verb (sold), but not an actor (the entity doing the selling). Under plaintiff's construction, an omission would signify an intent to include everything. *Cf.* William Strunk Jr. and E.B. White, *The Elements of Style* 18 (3d ed.1979) (when actor is removed from sentence written in passive voice, meaning becomes "indefinite"; unclear whether sentence applies to "some person undisclosed or the world at large"). A term that *could* apply to anyone or everyone is ambiguous, to say the least.

Op. and Order, dkt. # 47, at 11–12 (emphasis added).

Plaintiff cites a number of cases holding that broad language is not necessarily ambiguous simply because it is general enough to encompass more than one option. Plt.'s Br., dkt. # 52, at 6–7. *See also Mattheis v. Heritage Mutual Insurance Co.,* 169 Wis.2d 716, 487 N.W.2d 52 (1992)

(word "customer" broad but not ambiguous); *Shanks v. Blue Cross & Blue Shield United,* 777 F.Supp. 1444 (E.D.Wis.1991) (word "treatment" broad, but not ambiguous). It is true that language used in contracts may be broad without being ambiguous, but it does not follow that a contract is unambiguously broad because it is not clearly narrow. None of the cases plaintiff cites supports a presumption of breadth in the absence of limiting language.

■ Plaintiff brought its breach of contract claim on the ground that defendant refused to pay plaintiff market support for the "8 to 12 million pounds of 'ACQ Products' sold under license *by Osmose* to other ACQ treaters." Cpt., dkt. # 2, at 5 (emphasis added). To succeed on this claim, plaintiff had the burden of showing that the market support agreement covered ACQ sales *by Osmose.* *Household Utilities, Inc. v. Andrews Co., Inc.,* 71 Wis.2d 17, 28, 236 N.W.2d 663, 669 (1976) (burden of establishing existing of contract provision is on person attempting to recover for its breach). The market support agreement contains no language specifying whose sales it covers; its terms are neither broad ("by anyone"), nor narrow ("by Chemical Specialities").

As I noted in the original order, silence does not necessarily mean that a contract provision is ambiguous. However, courts holding agreements to be clear despite omissions are able to fill in the gaps by relying on other portions of the contract, parol evidence or some other default gap-filler; clear meaning is not created by virtue of the omission. *E.g., Kuehn v. Safeco Ins. Co. of America,* 140 Wis.2d 620, 626–27, 412 N.W.2d 126, 128–29 (1987) (determining parties' intent from extrinsic evidence where contract was silent on relevant issue); *Senn v. United Dominion Industries, Inc.,* 951 F.2d 806, 816 (7th

Cir.1992) (meaning of silence determined in light of explicit language). *See also Restatement (Second) of Contracts* § 204 cmt. c (although courts have authority to supply omitted material terms, doing so is not part of contract interpretation).

Plaintiff insists that the language in the contract is not ambiguous because it "sets forth CSI's obligation to pay based on an *act* (*i.e.* the sale of ACQ under certain circumstances), not based on that act being performed by a particular *actor* (*i.e.* the entity doing the selling.)" Plt.'s Br., dkt. # 65, at 4. That someone or some entity is performing the act of selling wood preservative is implied; wood preservative is not sold in the abstract. No court can determine the extent of defendant's obligation under the agreement unless it can identify that someone, whether it be an individual or a group. "[A] contract must be definite as to the parties' basic commitments and obligations." *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis.2d 158, 178, 557 N.W.2d 67, 75 (1996). This means that the "nature and extent" of the parties' basic commitments must be clear enough that a party can understand and perform his obligation. *Shetney v. Shetney*, 49 Wis.2d 26, 39, 181 N.W.2d 516, 522 (1970). "Vagueness or indefiniteness as to an essential term of the agreement prevents the creation of an enforceable contract, because a contract must be definite as to the parties' basic commitments and obligations." *Management Computer Services*, 206 Wis.2d at 178, 557 N.W.2d at 75.

■ Striking down a contract for uncertainty is disfavored. Courts are empowered to supply a deficient term when the parties' intent can be determined from the surrounding circumstances. *Lien v. Pitts*, 46 Wis.2d 35, 44, 174 N.W.2d 462, 467 (1970). In this case, it is clear from the circumstances that the parties intended that defendant would be obligated to pay market support payments for *its* regional ACQ sales; it was the only entity licensed to provide ACQ at the time and neither party disputes the agreement's application to these sales. "Additional obligations or undertakings may not be imposed upon a party to a contract under the guise or authority of contractual construction." 11 *Williston on Contracts* § 31:6 (4th ed.) This limitation "exists even where it is clear that had the attention of the parties been called to the omission, they would have, in all probability inserted the term." *Id.*

In support of the conclusion that the contract term was ambiguous, I quoted the following passage from *The Elements of Style:*

> My first trip to Boston will always be remembered by me.
>
> ... If the writer tries to make [this sentence] more concise by omitting "by me,"
>
> My first trip to Boston will always be remembered,
>
> it becomes *indefinite:* is it the writer or some person undisclosed or the world at large that will always remember this visit?

William Strunk Jr. and E.B. White, *The Elements of Style* 18 (3d ed.1979) (emphasis added). Plaintiff attempts to distinguish this rule, arguing that in this example, "the uncertainty was created by removing an actor that existed in a prior sentence. Here there is no earlier sentence to reference ...." Plt.'s Br., dkt. # 65, at 5. Plaintiff's attempt is novel but unsuccessful. The sentence "my first trip to Boston will always be remembered" is ambiguous because it has no defined actor; it is entirely irrelevant whether it was written this way initially or is the product of editing.

## 2. *Extrinsic evidence*

Because I concluded in the opinion and order of March 16 that the language in the market support agreement was ambiguous, I turned to extrinsic evidence. Two alternate grounds supported the conclusion that defendant was entitled to summary judgment. First, plaintiff failed to meaningfully develop any arguments relating to extrinsic evidence. Second, there was no record evidence that either party had manifested an intent or understanding that the market support agreement would extend to third party sales. Now, plaintiff argues that the court did not give proper consideration to its arguments regarding extrinsic evidence and alternatively, the court erred in granting summary judgment on the basis of extrinsic evidence when neither party argued for it.

### a. Arguments raised

It is surprising that plaintiff would assert that the court failed to consider arguments that it raised regarding extrinsic evidence because plaintiff made almost no argument to that effect. The following is the entirety of plaintiff's argument responding to defendant's position that the contract contained a latent ambiguity and that defendant was entitled to summary judgment in light of the extrinsic evidence:

> In sticking with its theme of looking at everything except the plain language of the agreement, CSI argues that the Marketing Support Agreement contains a latent ambiguity because it can not address the situation that has arisen in this case. CSI's sole support for this argument is the undisputed fact that CSI held an exclusive license to manufacture and sell ACQ in the United States at the time of the agreement.
>
> Contrary to CSI's argument, this undisputed fact does not create a latent ambiguity, but is actually fatal to CSI's argument. In the Marketing Support Agreement, CSI promised to pay Northern Crossarm "$0.50 per pound of ACQ Products sold to other ACQ treaters in your region." When CSI made this promise it solely controlled whether *any* ACQ would *ever* reach the region. It logically follows that CSI's promise related to *all* ACQ sold to the region. The agreement was designed to reward Northern Crossarm for developing a market for ACQ in its region. The fact that CSI licensed the product to Osmose who is selling to the region does not create any ambiguity, latent or patent. If it did, any party with a similar contract would be able to avoid its promise by making an end run through a license agreement. In the absence of a latent ambiguity, there is no need to resort to the extrinsic evidence offered by CSI. *Even if resort is made to extrinsic evidence, it helps Northern Crossarm, not CSI.*

Plt.'s Br., dkt. # 27, at 13–14 (emphasis added). Although the thrust of plaintiff's argument is that there is no latent ambiguity, I treated it as a discussion about extrinsic evidence generally. I rejected it because "[a]lthough [it] suggests that the parties *might* have agreed to payments for third party sales had they anticipated such sales, no evidence indicates that either party contemplated such a situation." Op. and Order, dkt. # 47, at 22. It is notable that in arguing that the court failed to consider other arguments it supposedly raised in its combined response and reply brief regarding extrinsic evidence, plaintiff does not identify what these arguments were or where they can be found in that brief. *See* Plt.'s Br., dkt. # 52, at 15–16.

### b. New arguments

Next, plaintiff contends that the court failed to consider certain undisputed extrinsic evidence. It points to evidence showing that at the time the parties en-

tered the agreement, defendant held an exclusive license to manufacture ACQ, both of its major competitors criticized the product openly and the parties defined the term "ACQ Products" in the supply agreement broadly. Plaintiff draws two inferences from this evidence: first, the parties intended that plaintiff would be entitled to payment for all regional ACQ sales and second, the parties intended the term "ACQ Products" to be very broad. But to draw the first inference, one must first conclude that the parties assumed that only defendant would make regional ACQ sales (and never considered the role of Osmose). Moreover, the fact that the parties may have intended the phrase "ACQ Products" to be broad does not show that either manifested an intention or understanding that the market support agreement would extend to third party sales. That defendant's actions disrupted the plaintiff's *implied* expectation that only defendant would be making regional ACQ sales provides the basis for a breach of the implied duty of good faith and fair dealing claim; it does not show a breach of the express terms of the contract. *Wisconsin Natural Gas Co. v. Gabe's Construction Co.*, 220 Wis.2d 14, 21, 582 N.W.2d 118, 120 (1998) ("[C]ompliance in form, not in substance breaches th[e] covenant of good faith.") (citations omitted).

### 3. Standards applied

#### a. Objective standard

Plaintiff contends that the court placed on it the burden of showing a *subjective* meeting of the minds with respect to an intent to include third party sales. At page 20 of the opinion, I noted that contract terms are created by a meeting of the mind, "*manifested* by mutual assent." Op. and Order, dkt. # 47, at 20 (quoting *Kozich v. Employee Trust Funds Board,* 203 Wis.2d 363, 378, 553 N.W.2d 830, 836 (1996)) (emphasis added). In addition, I

stated explicitly that "[a]lthough it is not necessary that the parties agreed to the same interpretation subjectively, it must objectively appear that the parties expressed an intent to agree to a certain term." *Id.* at 20–21, 582 N.W.2d 118 (citing *Management Computer Services,* 206 Wis.2d at 178, 557 N.W.2d at 75). In holding that defendant was entitled to summary judgment on the breach of contract claim, I concluded that "[v]iewing the evidence from an *objective* perspective, I cannot find that either party *expressed* an intent or understanding that the market support agreement would cover third party sales." *Id.* at 23, 582 N.W.2d 118 (emphasis added). Plaintiff's contention that the court demanded of it an insurmountable burden of showing a subjective meeting of the minds is unfounded.

#### b. Sua sponte action

Plaintiff argues that the court granted defendant's motion for summary judgment sua sponte and therefore improperly because neither party sought summary judgment on the basis of extrinsic evidence. In making this argument, plaintiff misrepresents both the record, *see* Dft.'s Br., dkt. # 19, at 16–19 (subheading 2 reads: "Extrinsic evidence resolves latent ambiguity . . ."); Dft.'s Br., dkt. # 30, at 14–15 (subheading II reads: "[Plaintiff] has no persuasive response to [defendant's] alternative argument that the marketing support agreement raises latent ambiguities that the undisputed facts resolve in favor of [defendant]"), and the opinion. Defendant raised the issues of ambiguity and the effect of extrinsic evidence clearly. The only "sua sponte" action taken was discussing the *limitations* on a court's ability to grant summary judgment on the grounds urged by defendant. The language plaintiff quotes from the opinion is from the introduction to a paragraph in which I noted that because interpretation

of extrinsic evidence is a question of fact rather than law, a court is empowered to grant summary judgment on the basis of extrinsic evidence only when it finds that no reasonable jury could find in favor of the non-moving party. Plaintiff cannot argue in earnest that it had no opportunity to develop arguments regarding the effect of extrinsic evidence.

### B. Duty of Good Faith and Fair Dealing

■ Under Wisconsin law, "the duty of good faith is an implied condition in every contract." *Estate of Chayka*, 47 Wis.2d 102, 107 n. 7, 176 N.W.2d 561, 564 (1970). The duty requires each party to refrain from acting in a way that "will have the effect of injuring or destroying the ability of the other party to receive the benefits of the contract." Wis. JI–Civil 3044. Its purpose is to guarantee against " 'arbitrary or unreasonable conduct' by a party," *Foseid v. State Bank*, 197 Wis.2d 772, 796, 541 N.W.2d 203, 211 (Ct.App.1995) (quoting Wis. JI–Civil 3044), and "opportunistic behavior that a mutually dependent, cooperative relationship might enable in absence of a rule." *Market Street Associates Ltd. Partnership v. Frey*, 941 F.2d 588, 595 (7th Cir.1991).

■ " 'Good faith' is a term frequently defined in the negative, such as 'the absence of bad faith.' " *Foseid*, 197 Wis.2d at 796, 541 N.W.2d at 213. Examples of bad faith include " '[e]vasion of the spirit of the bargain ... [and] abuse of a power to specify terms.' " *Id.* (quoting *Restatement (Second) of Contracts* § 205 cmt. d). The duty is breached when one party's actions deny the other the benefit of the bargain. *Wisconsin Natural Gas Co. v. Gabe's Construction Co.*, 220 Wis.2d 14, 21, 582 N.W.2d 118, 120 (1998) ("[C]ompliance in form, not in substance breaches th[e] covenant of good faith.") (citations omitted). "Subterfuges and evasions violate the obligation of good faith in performance even

though the actor believes his conduct to be justified." *Restatement (Second) of Contracts* § 205 cmt. d.

#### 1. *Failure to state a claim*

First, defendant argues that plaintiff failed to state a claim for breach of the implied duty of good faith because its allegation is nothing more than a duplicate of its breach of contract claim. In support of its argument, defendant cites a number of cases holding that a duty of good faith claim may not be premised on conduct authorized in the contract. Dft.'s Br., dkt. # 34, at 11–13 (citing *Wausau Medical Center S.C. v. Asplund*, 182 Wis.2d 274, 514 N.W.2d 34 (1994); *Interim Health Care of Northern Illinois, Inc. v. Interim Health Care, Inc.*, 225 F.3d 876 (7th Cir. 2000)).

■ Defendant raised this argument in its first brief, which it filed before this court's March 16 order was entered. Although it did not raise this argument again in its reply brief, it is not clear that it intended to waive it in light of that opinion. However, the argument is now disposed of easily. It is true that a duty of good faith claim may not rest on action authorized expressly in a contact. Dft.'s Br., dkt. # 34, at 11–13. *See also Wausau Medical Center*, 182 Wis.2d at 294, 514 N.W.2d 34 (rule applies when acts are *specifically authorized*); *Interim Health Care*, 225 F.3d at 884 (defendants' acts did not violate duty of good faith because "terms of contract *permitted* [ ]activity"). However, it may apply to conduct on which the contract is silent.

As noted above, in the March 16 order, I concluded that the parties had not anticipated third party sales and accordingly, had made no arrangements with respect to them. Neither party mentioned the possibility of third party sales. Although the parties did not reach an agreement that

defendant would make market support payments for third party sales, neither did they agree that defendant would be authorized to sublicense the right to sell ACQ in plaintiff's territory and not make support payments for the sublicensee's sales. It is not the case, as defendant argues, that plaintiff's good faith claim is a mere duplicate of its contract claim. I conclude that the parties never reached an agreement regarding third party sales and I turn to the merits of plaintiff's duty of the claim.

### 2. Merits

The heart of the parties' dispute is whether defendant upset the parties' contract expectations when it sublicensed ACQ technology, but refused to provide plaintiff with market support payments for Osmose's regional sales. *See* Plt.'s Br., dkt. # 54, at 11, Dft.'s Br, dkt. # 58, at 3. Both parties rely on the March 16 order in which I concluded that the terms of the market support agreement did not reach third party sales because there was no record evidence suggesting that either party had anticipated regional sales by a third party.

Defendant argues that this holding is dispositive of plaintiff's duty of good faith claim: "Since the parties did not even contemplate market support for third party sales, [plaintiff] cannot demonstrate that [defendant] breached its duty of good faith when [it] did not pay marketing support for the third party sales by Osmose in [plaintiff's] region." Dft.'s Br., dkt. # 58, at 3. Defendant reasons that because the duty of good faith is to protect party expectations, plaintiff cannot succeed because it did not expect market support payments for third party sales. *Id.* at 4. Defendant's argument is unpersuasive. It assumes that a party expects only that the other party will perform the obligations the parties agreed to expressly, when the implied covenant of good faith assumes that contracting parties expect also that the other party will refrain from acting in a way that would undermine the purpose or benefit of the arrangement. Wis. JI–Civil 3044 ("In determining whether the defendant breached the duty of good faith ... you should determine the purpose of the agreement; that is, the benefits the parties expected at the time the agreement was made."). *See also Restatement (Second) of Contracts* § 205 cmt. d. (evasion of the "spirit" of contract constitutes bad faith). "A party may be liable for a breach of the implied contractual covenant of good faith even though all the terms of the written agreement may have been fulfilled." *State v. Peppertree Resort Villas, Inc.,* 257 Wis.2d 421, 435, 651 N.W.2d 345, 352 (Ct.App.2002) (citing *Foseid,* 197 Wis.2d at 796, 541 N.W.2d 203).

■ Although I have concluded that the parties did not contemplate market support payments for third party sales, this conclusion was premised on a finding that the parties did not contemplate third party sales at all. Just as there is no record evidence that the parties decided that market support payments would be made for third party sales, nothing suggests that they agreed that the payments would not be made. The duty of good faith imports into contract those terms "the parties would have inserted [ ] if they had known what the future held." *Market Street Associates,* 941 F.2d at 596 (7th Cir.1991). It prevents parties from taking advantage of the relationship in a manner not contemplated at the time the contract was drafted. *Id.* at 595.

■ In the March 16 order, I reasoned that the parties might have contracted for market support payments for third-party sales had they anticipated the possibility of third-party sales:

The equities of the arrangement change little when sales are made by a third

party rather than defendant. Under the market support agreement, plaintiff helps develop a market for defendant's product and in exchange, defendant gives plaintiff a competitive advantage over other regional ACQ treaters by making payments commensurate with the increase in supply. Osmose's regional sales create increased competition for plaintiff; defendant benefits from plaintiff's marketing efforts through the royalties it receives under the sublicense contract.

Op. and Order, dkt. # 47, at 22. Under the sublicensing agreement, defendant continued to profit from regional ACQ sales and from plaintiff's marketing efforts but was not obliged to pay plaintiff market support payments.

Construing all the evidence in plaintiff's favor, a reasonable finder of fact could conclude that defendant deprived plaintiff of the benefit of the bargain struck in the market support agreement by granting a third party the right to sell ACQ in plaintiff's territory without making market support payments to plaintiff for these sales. *Zenith Ins. Co. v. Employers Ins.*, 141 F.3d 300, 308 (7th Cir.1998) (party claiming breach of duty of good faith "must show something that can support a conclusion that the party accused of bad faith has actually denied the benefit of the bargain originally intended by the parties") (citing *Foseid*, 197 Wis.2d 772, 541 N.W.2d 203). Plaintiff's "benefit" under the market support agreement is in essence monetary payment commensurate with the degree of increased regional competition as measured by the pounds of ACQ sold. If neither party anticipated third party sales, it follows that each must have assumed plaintiff would receive support payments for all regional sales because presumably, defendant would be making them all. Because defendant granted one of its competitors the right to manufacture and sell ACQ in plaintiff's region, millions of pounds of ACQ have been sold in plaintiff's region for which plaintiff has not received support payments.

Defendant argues that the facts show that it acted in good faith in carrying out the market support agreement; it notes that "[b]ecause Osmose was a major CCA manufacturer and a strong opponent of ACQ, [defendant] saw the license as a vehicle to improve the market position for ACQ by reducing criticism of ACQ in the marketplace." Dft.'s Br., dkt. # 34, at 13. Although the facts show that defendant *may* have been acting pursuant to this innocent motive, it is for the trier of fact to determine issues of motive. *Greer Properties, Inc. v. LaSalle National Bank*, 874 F.2d 457, 461 (7th Cir.1989) (summary judgment inappropriate on good faith claim where material issues of fact exist regarding motive). On summary judgment a court may not make credibility determinations, weigh the evidence or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir.2003). So long as a trier of fact could conclude reasonably that defendant used the sublicensing agreement as a means of avoiding its market support obligations, *cf. Trzcinski v. American Cas. Co.*, 953 F.2d 307, 313 (7th Cir.1992) (law presumes that people intend natural consequences of their acts), summary judgment is inappropriate. *Hayden v. La–Z–Boy Chair Co.*, 9 F.3d 617, 618 (7th Cir.1993) (summary judgment may be awarded against non-moving party only if court concludes that reasonable jury could not find for that party on basis of facts before it).

### C. *Unjust Enrichment*

 Under Wisconsin law, a party claiming unjust enrichment must show three elements: "(1) a benefit conferred upon the defendant by the plaintiff; (2) an appreciation or knowledge by the defen-

dant of the benefit; and (3) acceptance or retention by the defendant of the benefit under circumstances making it inequitable for the defendant to retain the benefit without payment of its value." *Puttkammer v. Minth*, 83 Wis.2d 686, 689, 266 N.W.2d 361, 363 (1978). Recovery on this claim is premised on the "moral principal that one who has received a benefit has the duty to make restitution when to retain such benefit would be unjust." *Id.* at 689, 266 N.W.2d 361. Plaintiff claims that defendant has been unjustly enriched by knowingly accepting and retaining the benefits plaintiff conferred through its extensive marketing efforts. Plt.'s Cpt., dkt. # 2, at 6–7.

In Wisconsin, "the doctrine of unjust enrichment does not apply where the parties have entered a contract." *Greenlee v. Rainbow Auction/Realty Co., Inc.*, 202 Wis.2d 653, 671, 553 N.W.2d 257, 265 (1996) (quoting *Continental Casualty Co. v. Wisconsin Patients Compensation Fund*, 164 Wis.2d 110, 118, 473 N.W.2d 584, 587 (1991)). Defendant argues that the market support agreement bars plaintiff's unjust enrichment claim. Although plaintiff concedes the general rule, it contends that there is an applicable exception where the contract does not address the parties' total business relationship. In support of this argument, plaintiff relies on the holding of the Supreme Court of Wisconsin in *Kramer v. Alpine Valley Resort*, 108 Wis.2d 417, 425–26, 321 N.W.2d 293 (1982).

In *Kramer*, the court permitted a promissory estoppel claim, which is also an equitable claim barred by the existence of a contract, despite the existence of a lease agreement between the parties. The plaintiff left a teaching position to become the director of an artisan cooperative operated through defendant, a four season resort. His decision was based largely on representations of how may people would walk through the art gallery daily. The gallery opened just a few weeks after plaintiff signed a lease to rent space for the cooperative, but remained open only three weeks, before defendant's principal owner made the unilateral decision to close it. The court reasoned that the lease did not bar the plaintiff's claim because it did not incorporate the obligations for which the plaintiff sought recovery under promissory estoppel. *Id.* at 424, 321 N.W.2d 293 ("The lease agreement represents one minor aspect of a larger business relationship. It is because the lease agreement fails to incorporate the obligations of Foxfire to plaintiff in its business endeavor generally that plaintiff is allowed recovery under promissory estoppel."). The court concluded that "[f]or Foxfire to argue that the lease agreement bars any recovery based on promissory estoppel completely ignores the fact that the same lease agreement is meaningless without Foxfire's underlying promise to continue operating." *Id.* at 425, 321 N.W.2d 293.

Although the market support agreement does not address all of the essential elements of the parties' entire business relationship, it differs from the lease in *Kramer* because it covers the aspect relevant to plaintiff's unjust enrichment claim: compensation for marketing efforts. "Wisconsin law does not bar a party from seeking equitable relief for a benefit conferred, *if* that benefit falls outside the scope of the parties' contractual relationship." *Utility Reduction Specialists v. Brunswick Corporation*, No. 96–C–253 (W.D.Wis. Mar. 11, 1997) (emphasis added). In this case, the benefit conferred (marketing) is clearly within the scope of the market support agreement. Thus, the exception to the general rule is not applicable.

Next, plaintiff argues that because the scope of the market support agreement has not yet been determined,

summary disposition of plaintiff's unjust enrichment claim would be in error. Resolution of the scope of the contract will establish only what defendant's obligations were, not whether defendant had any. It is not subject to dispute that the parties entered into a contract under which defendant would compensate plaintiff for its marketing efforts. Unjust enrichment is a quasi-contractual theory under which the law implies an obligation, *"in the absence of any agreement,* when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it." *Grossbier v. Chicago, St. P., M. & O. Ry. Co.,* 173 Wis. 503, 181 N.W. 746, 748 (1921).

It is of no consequence that the bargained for exchange might seem inequitable in light of subsequent unforeseen changes in circumstance. *Continental Casualty Co.,* 164 Wis.2d 110, 473 N.W.2d 584. In *Continental Casualty,* a primary malpractice insurer gave an excess insurer $200,000 and in exchange, was relieved of any further liability in a suit against a policy holder. When the policy holder was dismissed from the suit unexpectedly after incurring only $14,000 in defense costs, the primary insurer brought suit to recover the difference, claiming among other things, unjust enrichment. The Wisconsin Court of Appeals reversed the finding of the district court that the excess insurer had been unjustly enriched. The court of appeals reasoned that a contract bars an unjust enrichment claim even in circumstances that seem inequitable in light of unforeseen circumstances so long as the contract is valid and unenforceable. *Id.* at 118, 473 N.W.2d 584.

The present case is analogous to *Continental Casualty.* Although plaintiff may have conferred a benefit on defendant exceeding the value of the market support payments plaintiff received, the parties entered a binding agreement under which plaintiff is compensated for its marketing efforts. Unjust enrichment is not a mechanism for correcting soured contractual arrangements. Accordingly, defendant's motion will be granted with respect to plaintiff's unjust enrichment claim.

## ORDER

IT IS ORDERED that:

1. Defendant Chemical Specialities, Inc.'s motion for leave to file a surreply in opposition to plaintiff Northern Crossarm's motion to alter or amend is GRANTED;

2. Plaintiff's motion to alter or amend the court opinion and order entered on March 16, 2004 is DENIED;

3. Defendant's supplemental motion for summary judgment is DENIED with respect to plaintiff's breach of the duty of good faith and fair dealing claim and GRANTED with respect to its claim under the doctrine of unjust enrichment.