**CONSTRUCTION SERVICES IN SAMOA INC., Plaintiff,**

**v.**

**AMERICAN SAMOA GOVERNMENT, PORT AUTHORITY,**
**Defendant.**

High Court of American Samoa
Trial Division

CA No. 41-03

November 23, 2005

Before KRUSE, Chief Justice; ATIULAGI, Associate Judge; and MAMEA, Associate Judge.

Counsel: For Plaintiff, Charles V. Ala`ilima
For Defendant, David Cassetty, Attorney General, and Michael Kaiser, Assistant Attorney General

OPINION AND ORDER

## Introduction

On March 16, 2001, plaintiff Construction Services In Samoa ("CSS") entered into a construction contract with defendant American Samoa Government, Department of Port Administration ("ASG"). In short, the contract required CSS to complete the third and final phase ("Phase III") of a dock rehabilitation project ("the project") in the Pago Pago Harbor.[1] Although Phase III involved erecting a small guardhouse, a fence, and some drainage causeways, the vast majority of work (roughly 70-80%) involved pouring and finishing a concrete dock in the Pago Pago port.

The contract provided that all work would be "substantially completed" 335 calendar days from the date ASG issued CSS a Notice to Proceed. The contract also stated that the "[c]ontractor shall be considered in default . . . and default shall be considered as cause for termination" if, among other things, CSS: 1) "failed to perform the work . . . in accordance with the terms of the contract" or 2), "failed "to carry on the work in an acceptable manner."

The Notice to Proceed, which started the clock running on CSS's time to complete the contract, was issued on May 7, 2001. Shortly thereafter, CSS began to fall seriously behind schedule. According to weekly site meeting minutes, on July 21, 2001, some 77 days into the contract, CSS

---

[1] The Port Administration bid all three phases of the project separately. Phases I and II were completed before Phase III was put out for bid. CSS was not involved in the completion of Phases I and II.

had completed exactly 5% of the total work required by the contract. By August 23, 2001, one-third of the time allotted to finish the project had elapsed; CSS had completed only 6% of the total work. On January 31, 2002, ASG issued a notice stating its intent to terminate the contract for failure to perform the work. At that time CSS had completed just 8% percent of the total contract work, while approximately 77% of the allocated time to complete Phase III had elapsed.

There is no hiding the fact that as of the termination date, CSS was seriously, if not fatally, behind schedule.[2] The alleged reasons for the delay, however, form the backbone of this dispute. CSS argues that defects in the project plans caused unneeded delay, and further that Defendant exhibited a lack of good faith in carrying out the agreement.

Briefly on the design flaw issue, CSS claims that the project plans were defective; namely, that the concrete--which amounted to approximately 75% of the total work--would crack after it was poured under the current design.[3] CSS argues that because the concrete associated with Phase II showed considerable cracking, and because the concrete specifications for Phases II and III were the same, then the Phase III concrete would likely crack if they poured the concrete according to the existing plans.[4] They argue, without any citation to legal authority, that because Defendant issued them defective plans, Defendant breached the implied warranty of adequacy of plans and specifications, thus entitling CSS to contract damages.

After discovering the alleged design flaw, CSS sent a series of Request for Information ("RFI") letters to GMP & Associates, Inc. ("GMP"), an engineering group who ASG authorized to act in its shoes as project manager. The first RFI on the design defect issue, drafted and sent in late September 2001, asked GMP or the project designer to clarify the alleged concrete defect issue before CSS continued work. Given that CSS was already seriously behind schedule, GMP responded by telling CSS to continue the work despite the alleged design flaw. Although the contract terms expressly provide that the contractor is not liable for

---

[2] At trial, CSS's own project engineer testified that given how far behind schedule CSS was at the time of termination, it would have been impossible to complete the project in the contractually allotted time.

[3] ASG did not draft the plans. Lyons & Associates, a Hawaii-based design firm designed all three phases of the dock rehabilitation project. Lyons was not a party to this case.

[4] CSS acknowledged at trial that the concrete cracking in Phase II could have been caused by the phase II contractor. In fact, a subsequent investigation could not rule out that contractor error, rather than defective design, caused Phase II's cracked concrete.

design defects, CSS requested indemnification for any defects in the concrete resulting from the allegedly defective design.[5] On October 31, 2001, GMP acquiesced and indemnified CSS for any concrete cracking or concrete failure associated with the Phase III project. After issuing the indemnification, GMP told CSS to get to work. Instead, CSS requested indemnity directly from ASG, arguing that GMP lacked the authority to authorize indemnity on its own.[6]

Throughout this dialogue, CSS made no significant progress on the dock project. Accordingly, on December 10, 2001, GMP sent a letter to CSS expressing its intent to terminate the contract based on CSS's failure to perform the work in a timely or otherwise acceptable manner. CSS responded five days later arguing that much of the delay was rooted in GMP's refusal to clarify the design defect issue. The parties' positions remained virtually unchanged over the next two months, and on February 5, 2002, ASG formally terminated the contract.

With respect to the good faith issue, CSS maintains that ASG and its representatives dragged their feet in approving materials and responding to CSS's RFI's. CSS argues that the contract required ASG to approve materials before CSS could order them from suppliers. CSS contends that since ASG did not approve materials—particularly the concrete—in a timely manner, then CSS could not order the materials.[7] Because CSS did not have materials, they could not perform any work on the project.

For its part, ASG contests each of the reasons and submits that CSS's failure to timely perform the contract had nothing to do with ASG's actions or inaction. First, regarding the design defect issue, ASG maintains that under both accepted law and the contract's own terms, CSS would not have been liable for construction defects caused by a defective design. Because neither the contract nor case law requires CSS to indemnify ASG for design defects, CSS's concerns over its own

---

[5] Section 40-02(C) of the contract clearly provides that "the Contractor will not be penalized . . . because of errors or omissions in the plans or in these specifications."

[6] For reasons not made clear at trial, CSS believed that GMP's offer of indemnity had no force or effect. This proposition, however, is not supported by the contract's express terms, which authorizes GMP to act directly on ASG's behalf. Accordingly, GMP's offer of immunity had the same effect as if offered by ASG itself, a contract particular which should have been known to CSS.

[7] CSS's president, Moru K. Mane, testified to this effect repeatedly during trial. However, CSS can point to no evidence that tends to show that CSS asked for approval of the concrete samples prior to October 18, 2001, or that ASG dallied in giving approval prior to that date.

liability were unfounded. Thus, CSS should have continued working, especially after GMP clarified the issue. Moreover, ASG maintains that even if CSS was originally liable under the contract (which it clearly was not under the contract's express terms) for design defects, GMP relieved them of liability by indemnifying CSS in October 2001. Regardless, ASG maintains that CSS cannot unilaterally cease work on the project and still recover the contract price.

With respect to the good faith issue, ASG argues that any alleged failure to approve material submittals or respond to RFI's is simply untrue and does not excuse CSS's inability to perform. Regarding the RFIs, ASG maintains that it responded quickly, first telling CSS not to worry about the design issue and then indemnifying CSS from liability. Thus, ASG contends it timely addressed CSS's concerns. As to the material submittals, ASG points out that while concrete comprised 74% of the total contract work, CSS did not even make a concrete submittal until late October 2001, or more than five months *after* ASG issued the Notice to Proceed. Accordingly, ASG argues, whatever delay CSS faced in obtaining the concrete and beginning the concrete work was not caused by ASG's failure to approve the submittals.[8] In sum, ASG maintains that it timely responded to CSS's material submittals and RFI's, and therefore did not breach its duty to act in good faith.

### Discussion

CSS raised two issues at trial: first, whether ASG breached "the implied warranty of adequacy of plans and specifications," and second, whether

---

[8] Exactly why CSS waited so long to submit concrete samples for approval was never adequately, or clearly, explained at trial. Moru Mane, CSS's president, initially testified that CSS was behind schedule solely because ASG's representatives failed to approve the concrete submittals. On cross-examination, when evidence came to light that CSS did not even submit concrete samples for approval until late October 2001, Moru changed his story. In a nutshell, Moru testified that CSS needed to obtain the concrete samples from their competitors who were disgruntled because they themselves had bid on the phase III contract and lost to CSS. In essence then, Moru changed his testimony to allege that his competitors engaged in anti-competition practices that prevented CSS from making timely submittals. This testimony, however, sharply conflicts with other evidence that CSS attempted to purchase its own concrete crusher and generator as early as August 2001 for the purpose of producing its own concrete. Furthermore, evidence indicates that CSS only abandoned those plans in October 2001, five months into the contract period, when it was unable to obtain financing for purchasing the crusher/generator.

ASG breached its duty to deal with CSS in good faith. If ASG breached neither duty, then CSS's claims fail.

## I. The Implied Warranty Claim

■ American Samoa applies the common law to contract disputes unless it conflicts with local statutes or customs. A.S.C.A. § 1.0201. The generally accepted view at common law is that where a transaction's primary objective is to obtain services, the doctrines of implied warranty and strict liability do not apply. *See e.g., Allied Properties v. John A. Blume & Assoc.* (1972) 25 Cal.App.3d 848, 855. Thus, as a general rule in most jurisdictions, those who provide services to guide others in their economic, financial, and personal affairs are not liable in the absence of negligence or intentional misconduct. *Id.* To use California as an example, the rule has been consistently followed with respect to most professional services. *See e.g., Roberts v. Karr* (1960) 178 Cal.App.2d 535 (surveyor); *Gautier v. General Telephone Co.* (1965) 234 Cal.App.2d 302, (communications services); *Bonadiman-McCain, Inc. v. Snow* (1960) 183 Cal.App.2d 58 (engineer); *Lindner v. Barlow, Davis & Wood* (1963) 210 Cal.App.2d 660 (accountant); *Pancoast v. Russell*, 307 P.2d 719 (Cal. 1957) (architect).

While the general rule is that implied warranties do not arise in service contracts, there is some (albeit very limited) support for CSS's bare contention that in construction contracts the owner impliedly warrants the sufficiency of plans he tenders to the contractor. *APAC Carolina, Inc. v. Town of Allendale*, 41 F.3d 157, 163 (4th Cir. 1994); *Montrose Contracting Co. v. Westchester County*, 80 F.2d 841 (2nd Cir. 1941); *Souza & McCue Constr. Co. v. Superior Court*, 370 P.2d 338 (Cal. 1962).

In *APAC*, Welco, the primary subcontractor on a sewage treatment plant project, sued APAC (the general contractor) for breach of an oral agreement. *APAC Carolina, Inc.*, 41 F.3d at 159. Welco alleged that midway into the project APAC agreed to compensate Welco for additional work it needed to perform because of numerous inaccuracies and defects in the project plans and specifications.[9] *Id.* at 161. There, it was clear to both the APAC and Welco that the plans were defective, and as a result, Welco would need to perform extra work not contemplated in the original bid to complete its portion of the contract. *Id.* Welco was ready and willing to do the extra work, provided APAC agreed to pay for it. *Id.* When APAC agreed, Welco performed.

---

[9] Like the instant case, APAC had, prior to the project, provided project plans to Welco so that Welco could prepare its bid. *Id.*

When the project was finished, APAC reneged on its promise to pay for the extra work and Welco brought suit. *Id.* at 162. Welco alleged that under South Carolina law, a general contractor impliedly warrants that plans and specifications it furnishes to subcontractors are sufficient for their intended purpose; that purpose being a reliable basis on which a subcontractor can prepare his bid. *Id.* at 163. Because the plans were defective and required Welco to perform extra work, APAC, by virtue of this implied warranty, was required to pay for the extra work. *Id.* At the ensuing bench trial, the district court awarded Welco damages, and the Fourth Circuit affirmed. *Id.* at 164.

Similarly, in *Souza*, the California Supreme Court held that a contractor who uses defective plans as the basis for an otherwise low bid may recover in a contract action for extra work or expenses necessitated by the defective plans. 370 P.2d 338, 339-40. The court held that the rule is based mainly on the theory that furnishing misleading plans constitutes a breach of an implied warranty that the plans were correct. *Id.*

■ *APAC* and *Souza* demonstrate that the implied warranty of fitness of plans is simply irrelevant to the facts of this case. The rationale for the rule is to compensate the contractor for any *extra work* he was forced to do as a result of the defective plans. *See Allied Properties*, 25 Cal.App.3d at 857 (holding that "the rationale is that any additional costs caused by an error in the plans and specifications can be more equitably borne by the owner who receives the benefits than by the contractor.") This rationale cannot be readily transferred to a contractor who in fact incurs no additional costs because he in fact does no additional work.

■ Given the rationale for the implied warranty, we hold that necessary prerequisites to suit under this theory are: 1) completing the job as originally intended; and 2) performing extra work not originally contemplated at contract formation as a result of defective plans. The remedy for breach of the warranty to provide accurate plans is extra compensation for this extra work. Breach of the implied warranty does not, however, permit the contractor to stop working and then sue for the contract price.

When seen through this lens, one thing differentiates the plaintiffs above from CSS here. They worked. In fact, they performed extra work, and for this additional work they were permitted to bring suit for extra compensation not included or contemplated in the original contract. This scenario is not present here. When CSS brought the alleged defect to GMP's attention, GMP, acting in ASG's shoes, told CSS not to worry and to continue working. CSS did not. When CSS asked for indemnity for any defect arising out of the plans, GMP acquiesced. CSS still did not work. In fact, even though they were indemnified from any liability, by

February, more than three-quarters of the way through the contract period, CSS had completed only 8% of the total work due under the contact.[10]

Unlike *APAC* and S*ouza,* where the contractors completed work on the original contract and were entitled to sue for additional work caused by defective plans, CSS did not come close to completing the work due on the original contract, let alone perform additional work in order to complete the contract. Because completing the project as expected and performing extra work are prerequisites to suit under the implied warranty, CSS's claim fails.

## II. The Good Faith Claim

 It is axiomatic that in every contract there is an implied duty on behalf of the parties to deal with each other in good faith. *Maua v. Mulipola,* 12 A.S.R.2d 106, 107 (Trial Div. 1989). In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the

---

[10] CSS relies exclusively on *United States v. Spearin,* 248 U.S. 132 (1918), for the proposition that a contractor can recover on the contact after being given defective plans. CSS's summary of *Spearin's* holding, however, is erroneous, and a close reading of *Spearin* reveals it is inapposite to the instant case. There, a contractor for the Navy stopped working on a project when part of a sewer system it erected pursuant to specifications issued by the Navy failed. *Id.* at 134. Spearin promptly notified the Navy of the failure and stated it would cease working on the rest of the project unless the Navy assumed responsibility for the sewer damage since the damage arose out of defective plans the Navy gave Spearin. *Id.* at 135. The Navy, who refused to assume responsibility for past damage or indemnify Spearin for future damage, simply ordered Spearin to continue work at its own risk. *Id.*

On these facts, the Supreme Court held that the Navy prematurely terminated the contract when it refused to assume responsibility for past and future damage resulting from the defective plans. *Id.* at 137. Because the Navy breached the contract, Spearin was entitled to the benefit of his bargain, i.e., lost profits. *Id.* at 138.

The facts of the instant case differ materially from *Spearin.* The most obtrusive of which is that ASG readily agreed to indemnify CSS for any damages resulting from the allegedly defective plans. Moreover, the contract's express terms here provided that the contractor would not be responsible for design defects. Unlike the Navy in *Spearin,* ASG accepted responsibility for future damage and therefore cannot be said to have prematurely terminated the contract. Thus, because ASG did not breach, CSS is not entitled to the benefit of its bargain.

agreement. See e.g., *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 849 A.2d 382, 388 (Conn. 2004). To constitute a breach of the implied covenant of good faith and fair dealing, the defendant's acts must impede the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract. *Id.*

■ "Good faith" is frequently defined in the negative, such as the absence of bad faith. *Northern Crossarm Co., Inc. v. Chemical Specialties, Inc.*, 318 F.Supp.2d 752, 763 (W.D. Wis. 2004). Bad faith is not simply bad judgment or negligence, but rather implies conscious wrongdoing with a dishonest purpose, or affirmatively operating with "furtive design or ill will." *Elm Street Builders, Inc. v. Enterprise Park Condominium Assn., Inc.*, 778 A.2d 237, 247 (Conn. 2001). Generally, to prove a claim for bad faith the plaintiff must show either that the defendant engaged in conduct designed to intentionally mislead or to deceive, or that he neglected to fulfill a duty or contractual obligation and this neglect cannot be characterized as an "honest mistake." *Id.*

Here, CSS alleges that ASG acted in bad faith because it did not timely address CSS's RFIs, specifically, the RFIs concerning the alleged design defect. To recap this timeline: CSS first brought up the concrete issue on September 19, 2001, more than 4 months *after* the notice to proceed was issued. GMP responded on October 1, 2001, telling CSS to proceed anyway, albeit at their own risk. On October 31, 2001, in response to CSS's requests, GMP indemnified CSS from any liability arising from the Phase III concrete design. Despite being indemnified from liability, CSS did not pour a single drop of concrete from the date GMP indemnified it until the date of termination, more than three months later.

CSS also maintains that ASG's failure to timely approve material submittals, particularly submittals associated with the concrete, also constitutes a breach of the duty of good faith. However, CSS submits no evidence that ASG failed to timely respond to submittals. Furthermore, evidence adduced at trial indicates the CSS itself dallied in submitting concrete samples for over *five months* while it attempted to secure financing for its own concrete crusher and generator.

In light of the facts and the above discussed legal standard, we believe the question is whether ASG acted with a dishonest purpose designed to impede CSS's right to receive the fruits of the contract? *See De La Concha*, 849 A.2d at 388; *Elm Street Builders*, 778 A.2d at 247. From the evidence before the Court, we can only answer no.

On these facts, it is clear that at each stage, ASG and GMP did not act with ill will or attempt to frustrate CSS's contract rights. Rather, from clarification of the defect issue to indemnification from liability, ASG did

everything it could to *encourage* CSS to work, not discourage it. Furthermore, as noted above, it was CSS's actions, and not ASG's, that caused delay in ordering the concrete. Whatever role CSS believes ASG may have played in the delay, CSS offered no evidence indicating that ASG ever acted consciously with the purpose of depriving CSS of the benefits of their bargain. Regardless, on the evidence before us, AGS's actions in this case cannot be considered violative of their duty to act in good faith, and therefore cannot form the basis of CSS's suit.

## Order

CSS has failed to prove up its claims of breach of implied warranty and duty to act in good faith on the part of ASG. Accordingly, the complaint is dismissed and CSS shall take nothing thereby. It is so ordered.